# *Ex Parte* Louisville & Nashville R. R. Company.

*Certiorari to Review Decision of Court of Appeals.*

(Decided February 10, 1912.　Rehearing denied April 25, 1912.
58 South. 315.)

1. *Courts; Jurisdiction; Superintendence and Control.*—Section 140, Constitution 1901, authorizes the creation of an inferior appellate court with final appellate jurisdiction, but when such court is given final jurisdiction, the Supreme Court retains its power of superintendence and control, although deprived of appellate jurisdiction.

2. *Same.*—The power of the Supreme Court to superintend and control the Court of Appeals, under the act creating such court, will be exercised with great caution, but will be exercised to compel action within the jurisdiction of the Court of Appeals, and to preserve uniformity between the decisions of the two courts.

3. *Same; Remedy.*—Certiorari is an appropriate remedy to review the decisions of the Court of Appeals by the Supreme Court under its constitutional powers to superintend and control inferior jurisdictions.

4. *Constitutional Law; Judicial Construction; Re-adoption.*—Where the appellate courts have construed words as used in former constitutions, it will be assumed that such words when brought into subsequent constitutions were employed there subject to such judicial construction.

5. *Same; Self-Executing Provision.*—The provision of section 140, Constitution 1901, merely authorizes the legislature to establish an inferior court of final appellate jurisdiction, and does not in, and of itself vest an inferior appellate court with final jurisdiction.

6. *Carriers; Bill of Lading.*—A bill of lading is a receipt acknowledging the receipt and acceptance of freight, and is a contract binding between the parties.

[Ex Parte Louisville & Nashville R. R. Company.]

7. *Evidence; Parol Contract; Bill of Lading.*—A bill of lading issued by a common carrier contemporaneously with the acceptance of freight for transportation, and accepted by the shipper or his agent, is a contract binding on the shipper, though neither he nor his agent read it, and any parol agreement leading up to it, cannot avail to alter or vary the terms thereof, in the absence of fraud.

8. *Same; Contracts.*—Where freight is received and actually shipped under a parol contract, the subsequent receipt by the shipper of a bill of lading does not preclude the shipper from relying on the parol contract, unless the established custom makes the bill of lading the contract.

(Dowdell, C. J., and Sayre, J., dissent in part.)

Certiorari in Supreme Court.

Petition by the Louisville & Nashville Railroad Company to review by certiorari the decision of the Court of Appeals of Alabama in the case of J. J. Williams against the Louisville & Nashville Railroad Company. Writ awarded, and the judgment of the court of appeals reversed and remanded.

See *Williams v. L. & N. R. R. Co.,* 5 Ala. App. 615.

GEORGE W. JONES, J. M. FOSTER, S. D. FIELDS, and R. TYLER GOODWYN, for appellant. The rule requiring that all prior and contemporaneous negotiations and agreements concerning the making of a contract to be construed and read with reference to each other, applies to bills of lading as to other contracts, and in the absence of fraud or mistake, it is conclusively presumed that the oral negotiations are merged into the written contract or bill of lading.—*L. & N. v. Fulgham,* 91 Ala. 555; *Tallassee F. M. Co. v. Wes. Ry. of Alabama.,* 117 Ala. 520; *Delaware v. Oregon I. Co.,* 14 Wall. 579. A railroad company without special contract is not liable for goods carried beyond its line where it safely carries and safely delivers them to the connecting carrier, and a special contract to that end will not be gathered from doubtful expressions or loose language.—*Michigan Central v. Myrick,* 107 U. S. 102.

LUDLOW ELMORE, for appellee. While conceding the right and power of the court in certain cases to super-intend and control the judgments and decisions of the court of appeals by certiorari or other remedial writ, counsel insist that this is not a proper case for the exercise of this power, but no authority is cited to support the contention. Counsel insists that the telegrams passing between the parties, constituted a complete and enforcible contract.—*Baltimore S. P. Co. v. Patterson,* 106 Fed. 57; *N. P. Ry. Co. v. American T. Co.,* 195 U. S. 439. There was no delivery to the connecting carrier under the contract, and the railroad was liable.—*T. P. Ry. Co. v. Clayton,* 173 U. S. 248. From these authorities, the judgment of the court of appeals should be affirmed.

ANDERSON, J.—Section 140 of the Constitution of 1901 says: "Except in cases otherwise directed in this Constitution, the Supreme Court shall have appellate jurisdiction only, which shall be coextensive with the state, under such restrictions and regulations, not repugnant to this Constitution, as may from time to time be prescribed by law, *except where jurisdiction over appeals is vested in some inferior court, and made final therein;* provided that the Supreme Court shall have power to issue writs of injunction, habeas corpus, quo warranto and such remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions." (Italics supplied.) The Constitution authorizes the creation of an inferior appellate court with final jurisdiction, and, when said court is given final jurisdiction, this court is shorn of appellate jurisdiction, but the jurisdiction so made is subject to the superintendence and control of the Supreme Court by the express terms of the Con-

stitution. The Legislature did not intend to establish an appellate court with co-ordinate jurisdiction and powers with the Supreme Court, and could not have done so, under the Constitution, had it so intended. "It is not in the power of the Legislature to make the Supreme Court inferior in any respect to any other tribunal, but it remains, secure from legislative attack, the highest judicial power distributed by the Constitution. There must be in every state a court capable of exercising ultimate judicial power.   *   *   *   In this state *   *   *   that is the Supreme Court. If it were otherwise, there would be no organ of government capable of authoritatively settling judicial questions; and there must be such an organ there can be no doubt, for the judicial department is an independent one, and the element of sovereignty delegated to that department must, as in the case of the executive and legislative, reside, in its last and highest form, in one tribunal, one officer, or body of officers. While we are clear that no statute can deprive the Supreme Court of its rank as the highest and ultimate repository of judicial power, we are equally clear that appellate jurisdiction of an inferior grade may be conferred upon other appellate tribunals. The Legislature cannot, under the guise of conferring inferior appellate jurisdiction upon other tribunals, grant them unlimited appellate jurisdiction; but it may grant such tribunals appellate jurisdiction by limiting it to classes of cases not of the highest grade and restricting its authority to appeals from recoveries of a limited nature."—*Branson v. Studebaker,* 133 Ind. 147, 33 N. E. 98.

Not only does the Constitution reserve unto this court the power and authority to superintend and control the Court of Appeals, but the act creating the Court of Appeals (Gen. Acts 1911, p. 100, § 10) recognizes

the power of this court to control the proceedings and decisions of said Court of Appeals. It says: "The decisions of the Supreme Court shall govern the holdings and the decisions of the Court of Appeals, and the decisions and proceedings of such Court of Appeals shall be subject to the general superintendence and control of the Supreme Court as provided by section 140 of the Constitution of the state." The powers of this court to superintend and control the Court of Appeals should be exercised sparingly and with great caution, and so as not to hamper said court in the legitimate discharge of its duties and functions, or so as to render it a burden instead of a relief to this court. It was not intended that the Court of Appeals should be made merely a temporary stopping place for cases from the trial courts to this court, but that its decisions should be final and not interfered with by this court when acting within the confines of its jurisdiction and not in conflict with the former adjudications of this court, or except perhaps in other extreme instances not necessary to now mention, but when the interference by this court is essential to preserve a uniformity of jurisprudence.—*People v. Court of Appeals of Colorado*, 27 Colo. 405, 61 Pac. 592, 51 L. R. A. 105; *Ingersoll v. Minge*, 50 La. Ann. 748, 23 South. 889. It is true the Louisiana Constitution gave the Supreme Court the power to have the cases decided by the Court of Appeals sent up by certiorari for review, yet the court held that it was largely discretionary as to what matters would be reviewed, and that the right would be exercised only in special or extreme cases, whose peculiar circumstances justify a resort to it, stating: "Care being always taken against its abuse, to the impairment of the dignity and power and usefulness of the courts of appeal, and protracting litigation and deferring the final enforcement

of just rights." It is true our Constitution is not as specific as the Louisiana Constitution, but it gives this court the right to control and superintend all inferior jurisdictions by the process there mentioned or "such other remedial and original writs." It is sufficient to say that this court will exercise its powers cautiously and sparingly and only in extreme cases, not necessary to enumerate, and when not covered by the following instances. We will, however, invariably and unhesitatingly, by certiorari or other writs, superintend and control the Court of Appeals so as to compel action within its jurisdiction and prevent action beyond its jurisdiction, as well as to the extent of preserving uniformity and harmony between its decisions and those previously laid down by this court. As to other instances when this court will interfere, we need not now decide, but they must be extreme, and an interference by this court must be resorted to with care and caution.

This court has previously construed the meaning of the words "superintendence and control" as used in former Constitutions, and we must assume that, when they were brought forward into section 140 of the present Constitution, they were used and employed subject to their well-known interpretation. In the case of *Ex parte Croom & May,* 19 Ala. 566, it was said: "It is the duty of this court, in order to enable it to carry out the powers with which the Constitution invests it, on exercising 'a general superintendence of inferior jurisdictions,' to adopt such course of proceedings as will make its control complete.—*Ex parte Chaney,* 8 Ala. 424." In the case of *Ex parte Candee,* 48 Ala. 412, the court quotes approvingly from the case of *Ex parte Croom & May, supra,* and says: "Under this section of the Constitution, the Legislature may impose such restrictions and regulations, not repugnant to the Con-

stitution, upon the appellate jurisdiction of this court, but it has no power to limit or prescribe the mode and manner in which it must exercise its power to issue the writs therein named, and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions. If they could, the power thus conferred upon this court by the Constitution might be so crippled and embarrassed as to render it worthless for the great and salutary purpose contemplated by the Constitution."

It must be observed that section 140 of the present Constitution does not in and of itself vest the appellate court with final jurisdiction, but simply authorizes the Legislature to establish an inferior court of final appellate jurisdiction, but which said final jurisdiction must of necessity be subject to the general control and superintendence of the Supreme Court. The case of *People v. Richmond,* 16 Colo. 285, 26 Pac. 929, is not opposed to the present holding as it was discussing a Constitution not identical with ours, and was considering the constitutionality vel non of the act establishing the appellate court, and the right or authority of the Supreme Court to superintend and control said court was not directly involved. Moreover, the Colorado court did not regard it as confining the Supreme Court to the power only of keeping the appellate court within its jurisdiction, for in the later case—*People ex rel. Green v. Court of Appeals,* 27 Colo. 405, 61 Pac. 592, 51 L. R. A. 105—the court stated: "Without attempting to specify the reasons that may be sufficient to justify us in exercising the power in other cases, we are of the opinion that it may be resorted to in the following instances: First, when the Court of Appeals is without jurisdiction to review the judgment in question; second, when in a clear case it refuses to be guided or

controlled by the law as laid down in the prior decisions of this court. In this event, it would become our imperative duty to resort to it, in order to enforce uniformity of decision in the appellate courts of the state."

The petitioner in the case at bar seeks a certiorari upon the sole ground that the decision of the Court of Appeals is contrary to and in conflict with existing decisions of this court, and, if the allegations are true, we are of the opinion that certiorari is the proper and appropriate remedy to review the decision of said Court of Appeals and to correct the same so as to preserve uniformity of legal decisions.—*Miller v. Jones*, 80 Ala. 89; *Camden v. Bloch*, 65 Ala. 236; *McAllilley v. Horton*, 75 Ala. 491; *McCulley v. Cunningham*, 96 Ala. 583, 11 South. 694. Indeed, opposing counsel does not question the right of this court to control the decisions of the Court of Appeals, but concedes the correctness of the present holding as to the right to issue the writ of certiorari, if the allegations of the petition are true, but insists that the petitioner is not entitled to relief, for the reason that the decision complained of is sound, and should not be disturbed by this court.

Bills of lading are both receipts and contracts to carry. So far as they acknowledge the delivery and acceptance of the goods, they are mere receipts. As to the rest, they are contracts, and are binding as such on the parties to them and the terms thereof cannot be varied by parol.

A bill of lading issued by the carrier upon receipt of the shipment and accepted by the shipper or his agent becomes the sole repository of the contract, and any transactionns or agreements leading up to it cannot avail to alter or vary the terms thereof.—*L. & N. R. R. Co. v. Fulgham*, 91 Ala. 555, 8 South. 803; *Tallassee Co. v. Western Ry. Co.*, 117 Ala. 520, 23 South. 139, 67

Am. St. Rep. 179; Hutchinson. on Carriers, § 167; Elliott on Railroads, §§ 1415-1424. It is true the bill of lading is issued by the carrier, and is merely signed by the agent alone, but in the absence of fraud, if it is accepted by the shipper or his agent, it becomes binding on him as he is assumed to have read it, or, if he does not read it, it is his own fault, and, if he cannot read, he should ask that it be read to him.—*Western Ry. v. Harwell,* 91 Ala. 340, 8 South. 649; *Jones v. Cincinnati R. R. Co.,* 89 Ala. 376, 8 South. 61; *A. G. S. R. R. Co. v. Little,* 71 Ala. 611; *Steele v. Townsend,* 37 Ala. 247, 79 Am. Dec. 49.

There is a well-known exception, however, to the general rule that the bill of lading after acceptance becomes a special contract and binding on both parties, as recognized by the text-writers and in the decisions of the courts. "Where, however, goods are received and are actually shipped under a parol contract, the subsequent receipt of the bill of lading does not preclude the shipper from showing the terms of the parol contract, unless it appears that between the shipper and the carrier the established custom has been for the former to receive bills of lading constituting the contract after shipment." This exception has been recognized by our court in the case of *L. & N. R. R. Co. v. Meyer,* 78 Ala. 597, wherein the court held that the shipper was not bound by the recitals in a bill of lading, which he did not read, and which was delivered to him a day after the delivery of the goods, and after the payment of the freight. It was said, however, in the opinion: "If contemporaneously with the delivery of the goods to the railroad he had received the bill of lading containing such stipulation, he would be conclusively presumed to have read it, and to have acquiesced in it.—*Goetter v. Pickett,* 61 Ala. 387; *Dawson v. Bur-*

*rus,* 73 Ala. 111. And this would have been no hardship, for he would then have it in his power to reject the terms. Failing to read the contract he was accepting might be fairly interpreted as an expression of full confidence and an agreement to accept the terms they would offer. That is not this case." We may add that it was not the case as then considered, but the facts there hypothesized are rather analogous to the case now before us and the case of *Jones v. Cincinnati R. R. Co., supra,* wherein said *Meyer Case, supra,* was referred to as standing upon its own peculiar principles, "and is distinguishable from this." The bill of lading in the case at bar, being issued contemporaneous with the delivery of the cotton and accepted by the plaintiff's agent, whether he read it or not, became the sole repository of the contract of shipment, and either embraced, canceled, or modified all previous agreements or negotiations anterior to same. The Court of Appeals erred in holding that the telegraph communications and negotiations constituted the real contract between the parties, instead of the bill of lading, and the said ruling was in conflict with some of the Alabama cases, supra.

The decision of the Court of Appeals seems to have been largely influenced by the case of *Northern Pac. R. R. v. American Trading Co.,* 195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269. This case, however, is distinguishable from the case at bar, as the bill of lading there issued was subsequent to the receipt of the shipment, and was issued after the lead had been shipped from Newark, and had departed for its destination, and there was, of course, no acceptance, express or implied, of the bill of lading as the contract of carriage. This fact is stressed by the court as the pivotal point against an implied acceptance of the bill of lading as a contract and as a change of the previous agreement. Says

the court: "At the time when the bill of lading was issued, the lead had been shipped at Newark, and had departed for its destination. It was impossible for the trading company to recall it.  *  *  *  Where the acceptance of the bill of lading, under these circumstances, is sought to be made an equivalent to an. assent to the change of contract, it is proper to look at these facts in order to determine what weight should be given such acceptance. At the time it was received the lead was out of the possession of the trading company, on its way West." This case is somewhat analogous to the *Meyer Case, supra,* and which was distinguished from the case of *Jones v. Cincinnati R. R., supra,* and falls within the influence of the exceptions as set out in section 1423, Elliott on Railroads. Hutchinson on Carriers, § 172. It is true the opinion in the case of *Northern Pac. R. R. v. American Trading Co., supra,* mentions the fact that there was no new consideration for a change in the contract, but this was not decisive of the case. It was arguendo and gratuitous. In this jurisdiction a new consideration was not essential to the validity of the last contract changing or modifying the former one, if said last contract was accepted.— 2 Mayfield's Dig. p. 798, § 692, and cases there cited.

In the case at bar the bill of lading was issued contemporaneous with the shipment, was received by the plaintiff's agent, and, whether read by him or not, his retention of same and failure to note the changes or modifications of the previous agreement in time to reclaim or recall the cotton, while within his power to do so, was an implied acceptance of the bill of lading, and which thereby became the sole repository of the contract. This rule may sometimes prove harsh, but any other one, or a relaxation of the present one, may lead to confusion as well as weaken the salutary doctrine of

confining parties to the last solemn written contract as the sole exponent of the agreements and negotiations anterior thereto. Better that an individual shall suffer loss than to modify a well-established rule by declaring a new one, the evil consequences of which cannot be foreseen.

As to what the plaintiff's rights are under the bill of lading, or whether or not he was entitled to recover under this contract, is a question with which we are not concerned, and which must be considered by the Court of Appeals. It is sufficient to say that said court erred in not holding that the bill of lading was the sole repository of the contract of shipment, and its decision must be reversed on this point, and the cause is remanded to said Court of Appeals for further consideration.

The writ of certiorari is awarded and the judgment of the Court of Appeals is reversed, and the cause is remanded.

Reversed and remanded.

SIMPSON, MCCLELLAN, MAYFIELD, and SOMERVILLE, JJ., concur. DOWDELL, C. J., and SAYRE, J., concur, except as to the power of this court to review, and therefore dissent on this point.

SAYRE, J.—(dissenting in part).—In determining whether this court should assume jurisdiction of this case, it becomes necessary to inquire into the nature and extent of this court's supremacy under the Constitution and laws as related to the Court of Appeals.

Section 140 of the Constitution reads as follows: "Except in cases otherwise directed in this Constitution, the Supreme Court shall have appellate jurisdiction only, which shall be coextensive with the state, under such restrictions and regulations, not repugnant

to this Constitution, as may from time to time be prescribed by law, except where jurisdiction over appeals is vested in some inferior court, and made final therein; provided, that the Supreme Court shall have power to issue writs of injunction, habeas corpus, quo warranto, and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions." The act of March 9, 1911, creating the Court of Appeals (Gen. Acts 1911, p. 96), provides that: "Said court, except as to actions involving the title to or possession of lands and except as herein otherwise provided, shall have final appellate jurisdiction, coextensive with the state, of all suits at law where the amount involved, exclusive of interest and costs, does not exceed the sum of one thousand dollars, of all misdemeanors," etc. Section 2. Section 10 of the act is in this language: "The decisions of the Supreme Court shall govern the holdings and the decisions of the Court of Appeals, and the decisions and proceedings of such Court of Appeals shall be subject to the general superintendence and control of the Supreme Court as provided by section 140 of the Constitution of the state." The words "except as herein otherwise provided," where they occur in section 2 of the act, refer to certain cases in which the act, and the amendment of April 18, 1911 (Gen. Acts, p. 449), make provision for the certification of causes, and in some instances specific questions, by the Court of Appeals to the Supreme Court for decision. Such provision is made for cases in which the constitutional validity of statutes is involved, in which cases also provision is made for a writ of error from the Supreme Court to the Court of Appeals under some circumstances, for cases in which the judges of the Court of Appeals may be in disagreement, and for cases in which two or more

of the judges of that court are disqualified. Such exceptional provisions do not affect the case in hand nor the general question involved. The act confers final appellate jurisdiction upon the Court of Appeals in pursuance of the authority of the Constitution, so that, in reaching a conclusion as to the true intent and meaning of the Supreme Court's supremacy in the ordinary case of which the Court of Appeals has jurisdiction, we need only to consult the language and history of the quoted section of the Constitution. And here it is proper to note that we have examined the Constitutions of all the states as they stood down to the year 1894, and have found that, while in many instances they provide that courts of last resort shall have appellate jurisdiction only, and recognize the clear distinction between appellate jurisdiction and superintending control by proceeding further to confer such control over inferior courts, being to this extent in full substantial accord with our present Constitution and all its predecessors, none of them contain authority for the erection of an inferior court with final appellate jurisdiction, so that the provision here under inquiry is peculiar to the fundamental law of this state, and the decisions from other states touching the validity and effect of statutes creating intermediate courts of appeal, for such they are in those jurisdictions, though shedding interesting side lights upon the question at issue, are not of controlling value as precedents.

Section 140 of the Constitution of 1901 employs language identical with that employed in the corresponding section of the Constitution of 1875, save that the words, "except where jurisdiction over appeals is vested in some inferior court, and made final therein," have been intercalated, and all previous Constitutions contained a provision identical with that of 1875, except

that in the earlier instruments mandamus was includ-
ed among the writs specifically named as those by means
of which the Supreme Court's power of superintendence
and control was to be exercised. But to this omission
no importance can be attached on the present inquiry;
the idea behind it probably being that mandamus was
more appropriately left to fall among remedial and
original writs not specifically named—a mere matter
of arrangement. The language which authorized the
creation of the Court of Appeals as a court of appellate
jurisdiction, and which appeared for the first time in
the Constitution of 1901, expressly assigns to that
court a place among inferior courts. "Inferior," as
applied to courts, has several meanings. In one sense
all courts from which an appeal or writ of error lies
are inferior in relation to the court before which their
judgments may be carried, and by which they may be
reviewed, annulled, or affirmed.—*Nugent v. State,* 18
Ala. 521. But that is not the sense in which the Court
of Appeals is inferior to the Supreme Court, for the
use of the word "final" in describing the jurisdiction
which might be conferred upon that court plainly and
definitely excludes an interpretation of the intercalated
words which would authorize the Supreme Court to as-
sume revisory appellate jurisdiction of cases which
have been decided by the Court of Appeals. That the
jurisdiction and decisions of the Court of Appeals are
final is determined by the language of the act, and it
is entirely clear that they are intended to be final in
the sense that no appeal, writ of error, or other appel-
late writ can be taken. There can be no plausible con-
tention that the word "final" in the act means anything
different from the same word in the Constitution. The
Constitution at the point in question deals with appel-
late jurisdiction—nothing else. In that connection

"final" could only be appropriately used as distinguished from "appealable." In this state the extreme doctrine that the Legislature has all power not prohibited to it by the Constitution has always prevailed. Under no previous Constitution has there ever been any obstacle in the way of the creation of intermediate courts of appeal. In many of the states having constitutional provisions in every substantial particular identical with ours Courts of Appeal inferior to the Supreme Courts of those states have been created; and the questions treated in the cases from those jurisdictions have arisen in regard to how far the Legislature might go in the creation of such courts and in giving them final jurisdiction without trenching upon the supreme appellate power of the courts placed by their Constitutions at the head of their judicial system. The reported cases show that these questions have led to great embarrassment, well known to the framers of our Constitution of 1901, and they, appreciating the necessity of relief to the Supreme Court, and that a Court of Appeals of merely intermediate jurisdiction would incumber rather than relieve the system, provided that the Legislature might curtail the number of cases seeking the Supreme Court by diverting some of them to an inferior court of appeals whose dispositions might be final. That was a wise solution of the difficulties of the situation, and all the significance, wisdom, and effect of the innovation is to be found in the word "final."

Again, courts are said to be inferior, as distinguished from courts of constitutional origin, in that they owe their existence to statutory enactments. In *Perkins v Corbin*, 45 Ala. 103, 6 Am. Rep. 698, it was said: "There are other courts, called. in the Constitution 'inferior courts of law and equity,' which 'the General Assembly

may from time to time establish.' These latter courts derive their existence from legislative enactment. They are the creatures of the law-making power of the state." And in *State ex rel. Winter v. Sayre*, 118 Ala. 1, 24 South. 89, decided in 1897, this court, after referring to another principle held in *Perkins v. Corbin,* said: "That which is now of the more importance is the explicit affirmation by the court of the plentitude of legislative power in the creation and abolition of inferior courts, and the exposition of the distinction between such courts and the permanent continuing courts of the Constitution." In this sense the Court of Appeals is inferior to circuit, chancery, and probate courts, as well as to the Supreme Court, and this although appeals may be taken to it from the circuit courts. Since then no appeal will lie from the Court of Appeals, organized with jurisdiction coextensive with the constitutional authority in such case, and, since there is a large part of the supreme judicial power of the state which may not be exercised by writs of appeal, the conclusion seems clear that the Court of Appeals is inferior to the Supreme Court, not only for the reason that its jurisdiction is statutory and limited, but that the Supreme Court must exercise superintending control over it in common with all other inferior courts.

But the power and duty of the Supreme Court to revise the decisions of the Court of Appeals are supposed to be conferred and enjoined by the proviso of section 140 which has been common to all our Constitutions. The language of the proviso goes no further than to confer "a general superintendence and control of inferior jurisdictions." But the argument for review, apart from some considerations of policy and convenience which are suggested, proceeds thus: That prior to the Constitution of 1901 this court uniformly held

that the proviso did not confer original jurisdiction,
but that the power specified therein, was revisory
though exercised through the instrumentality of orig-
inal remedial writs; that the Supreme Court must con-
tinue in the exercise of such revisory jurisdiction over
the Court of Appeals among other inferior courts, for
otherwise the Constitution has made it possible for the
Legislature to deprive the Supreme Court of all power
and authority to decide substantive principles of law by
which the political, personal, and property rights of
the people of this state are to be affected, controlled, and
regulated, and thus this court may, by future legislative
enactments, be reduced to the status of a mere police
guard, so to speak, standing on the jurisdictional con-
fines of the lower courts, with no power except to keep
those courts within the bounds of their jurisdiction, and
that an appellate court which has been reduced to such
poverty of jurisdiction could no longer be supreme, as
the Constitution contemplates this court shall be.

In determining the question at hand, we are not
concerned about what the framers of the Constitution
ought to have done so much as we are about what
they have done. In them was invested an unlimited
power of proposal, and, in the ratification of the instru-
ment proposed, the people of the state exercised an in-
herent sovereign power subject only to the Constitution
of the United States. What, then, have they done?
Putting aside restrictions and regulations to be pre-
scribed by the Legislature from time to time, as compre-
hending those reasonable regulations and restrictions of
the time and manner in which the right of appeal may
be exercised, and not as conferring power to deny the
right itself, and eliminating the cases in which original
jurisdiction is expressly conferred upon the Supreme
Court, as without importance in this connection, the

Constitution of 1875, in common with antecedent statements of the fundamental law, used language which meant this: The Supreme Court shall exercise its supreme judicial power in all cases arising in any of the courts of this state, but this power shall be exercised by appeal only; provided, that the Supreme Court may issue such original remedial writs as may be necessary to give it a general superintendence and control of inferior jurisdictions. This provision at its outset conferred upon the Supreme Court appellate jurisdiction of all cases arising in all the courts of this state. Nothing further was needed in the way of conferring a revisory jurisdiction the most comprehensive possible. But cases might arise, and frequent cases have arisen, in which the ends of complete justice, and the fundamental principle of American law and the system from which it is largely derived, that no one shall be finally divested of his liberty or his property by the judgment of a single individual or tribunal (2 Andrews' American Law, § 796), required the exercise of a supreme jurisdiction, not only appellate or revisory, but supervisory, a jurisdiction which might resort, not only to the customary writs of appellate procedure, but to original and remedial writs, as where, for example, inferior courts usurped jurisdiction, or refused to exercise the jurisdiction conferred on them. Such cases the proviso was intended to reach, superintend, and control. Nor can it be denied that the jurisdiction here granted was used as auxiliary to appellate power, as where, for example, nonappealable interlocutory judgments or decrees wrought injury to the legal rights of parties which would otherwise be remediless; and in cases where a statute created a new jurisdiction, and the court or officer exercising it proceeded in a summary mode, or in a course different from the common

law, no remedy for revision being given by the statute creating the jurisdiction, the Supreme Court, under the authority of the proviso, followed the principle of common law, and by its writ of certiorari superintended and revised the operation of the new jurisdiction.— *Ex parte Buckley,* 53 Ala. 42. But all these were cases in which the court, subjected to supervision, which sometimes took the form of revision, by means of original writs, was exercising an original jurisdiction. They proceeded upon the theory in order to prevent failures of justice, there must in every case be afforded resort to a superior appellate and superintending jurisdiction which at that time was to be found nowhere else than in the Supreme Court. They furnish no analogy for the revision of a jurisdiction, itself made revisory only and final by the law of its creation for the simple reason that, under the Constitution and laws of that time, there was no such jurisdiction. The jurisdiction then exercised, in all phases of its application, the Supreme Court still has, and will continue to exercise, for the revision and supervision of the judgments and decrees of courts of inferior dignity and power, by writs of appeal or original and remedial writs, "except where," to quote the language now for the first time found in the Constitution, "jurisdiction over appeals is vested in some inferior court, and made final therein." The Constitution defines the exception as clearly as it does the grant. To hold in view of this exception that this court may revise the judgments of this new jurisdiction for error by any character of writ would, by judicial construction, nullify the statute which provides that the judgments of that court rendered on appeal shall be final. It would be to hold that by the proviso the framers of the Constitution intended to set at naught the new provision which they had been at pains

to formulate. No doubt, however, as already intimated, this court, by virtue of its supremacy in the judicial system of the state, may and will, if occasion should arise, supervise, superintend, and control the Court of Appeals so as to keep it within the bounds of its jurisdiction, and require it to exercise the jurisdiction vested in it by the Constitution and the statute of its creation.

To the suggestion that the conclusion we have reached will impair the supremacy of this court, it may be enough to say that this court has only such supremacy as has been conferred on it by the Constitution, and can claim no more. But we apprehend that the real supremacy of this court has not been impaired. Not only has its general superintendence and control over all courts been preserved, but, as has been well said, the supremacy of the Supreme Court "is to be found, not in the extent of its jurisdiction or in the amount of its business, but in the paramount force and authority of its adjudications—a force acting directly in controlling, without being controlled by, other tribunals, an authority acting indirectly from the respect and deference due to the highest tribunal known to the Constitution and laws."—*Sharpe v. Robertson*, 46 Va. 518-606. The statute, as we have seen, provides that the decisions of the Supreme Court shall govern the holdings and the decisions of the Court of Appeals. That declaration of the statute is, however, altogether superfluous, for the Constitution, when it vested the supreme judicial power of the state in the Supreme Court, gave supreme authority to its judgments in the cases decided, and in all other cases, in whatever court pending, all the force and effect a judicial precedent can have. But the constitutional authority of the Supreme Court does not, nor can the declaration of the statute, unless in cases publici juris, operate as a limitation upon the judicial pow-

er of the Court of Appeals to decide for itself the law of any case within its jurisdiction, for the positive authority of every judicial decision is coextensive only with the facts upon which it is founded. It is inherent in the nature of judicial decisions that this is so. The Legislature has no authority to direct the judiciary how laws shall be interpreted.—*Lindsay v. Savings & Loan Ass'n,* 120 Ala. 156, 24 South. 171, 42 L. R. A. 783.

Specifically, the application is for a writ of certiorari. There can be no expectation of any save the common-law writ, for the statute makes no provision for such or any other writ. It provides only that "the decisions and proceedings of such Court of Appeals shall be subject to the general superintendence and control of the Supreme Court as provided by section 140 of the Constitution of the state." The argument suggests that the writ of certiorari has been named as most appropriate for the occasion because that writ is not a writ of right, but will be granted or denied in the sound discretion of the court, according to the circumstances of each case and as justice may require, thus intending, it seems, to relieve the court of establishing a precedent which would be available for the review of every case decided in the Court of Appeals of which the unsuccessful party is prepared to affirm error. Reference is also made to the practice of the Supreme Court of the United States in reviewing the Circuit Courts of Appeals. As to the use of the writ of certiorari in those courts, it is to be observed that the statute creating the Circuit Courts of Appeals provides for a review by certiorari in a limited class of cases. The provision is: "And excepting also that in any such case as is hereinbefore made final in the Circuit Court of Appeals it shall be competent for the Supreme Court to require, by certiorari or otherwise, any such case to be certified to the Supreme Court

for its review and determination with the same power and authority in the case as if it had been carried by appeal or writ of error to the Supreme Court."—U. S. Comp. Stat. 1901, p. 550. And so the Legislature might have provided in the case of the Court of Appeals. But as yet it has not done so. It has provided that the judgments of the Court of Appeals shall be final, without more, and it had express and ample constitutional authority for so providing. And the Legislature may hereafter provide for a review in this court of cases properly taken in the first instance by appeal to that court, whenever and to whatever extent it may appear to be necessary in order to preserve the uniformity of the law, which is one of the reasons for an undivided supreme appellate jurisdiction. But, when it shall be determined that such time has arrived, it will be necessary to consider that as a court of administration this court has no peculiar advantages, and that the justice of individual cases may as well be dispensed in other tribunals. The chief value of a Supreme Court lies in its power to shape the jurisprudence of the state, in the fact that it is a tribunal in which the general principles of law may be settled, upon thorough discussion, mature consideration, and deliberate conference (46 Va., supra); that the burden of a huge docket of causes brought to this court by an excess of jurisdiction and by the contentions incident to the rapid development of the political and business interests of a great commonwealth induced perhaps a degree of haste, certainly an undue pressure of responsibility, in the consideration and formulation of opinions, which furnished the occasion and the reason for a change in the Constitution and the enactment of the law creating an inferior appellate jurisdiction whose decisions might be final, and that, to the extent the decisions of the Court of Appeals are depriv-

ed of finality, the value in one sense of both courts will be impaired. On the other hand, it may be a necessity growing out of the constitutional supremacy of the Supreme Court that the jurisdiction of the Court of Appeals be so arranged and adjusted that a substantial residuum of every class of cases remain undisturbed in the Supreme Court, or a review be provided for, so that it may declare the principles of law to be observed in all classes of cases. As the statute has been framed, it has not encroachment upon the supremacy of the Supreme Court. Nor, on the other hand has it allowed any discretion. If, under this statute, this court may review one case, it must review all. There is no authority for this court to discriminate among cases. The form of writ contemplated in the application would be of no moment if the right of review existed, for a court of supreme judicial power has the right to mold its own writs to meet the lawful exigencies of every case. The question here is a question of power, not form or discretion. The power to review must be worked out, if at all, through the proviso of section 140 of the Constitution without any aid from the statute. I believe the court has assimilated a power which the Constitution authorized the Legislature to withhold and which it has withheld. This it has done with benevolent intentions, of course, but without authority nevertheless, as it appears to me. For this reason I respectfully dissent.

DOWDELL, C. J., concurs in this dissent.

MAYFIELD, J.—I concur in the conclusion of the majority, and in most all that is said in the opinion of Justice ANDERSON; but desire to add the following:

A more important question could not well be presented to this court than the one here presented—the ques-

tion of the extent of the power of this court to review
and control the judgments and decisions of the Court
of Appeals. All agree that under the Constitution of
this state there can be but one Supreme Court. This
is necessary to insure uniformity of decisions. If there
were, or could be, two or more independent supreme
courts, a diversity of judgments and decisions would
necessarily arise, both as to the limits of the jurisdic-
tion of each court, and as to the fundamental doctrines
of constitutional, civil, and criminal law. The effect
would be to have a different rule promulgated as to all
of the most important subjects of litigation by these
several tribunals. The people would be involved in
endless doubt as to both their rights and their public
duties. The Constitution itself as was said by Judge
Story, would be made to speak a different language,
according to the tribunal which was called upon to ex-
pound it, and thus indeterminate disputes would em-
barrass the administration of justice throughout the
land. The Constitution, however, authorizes the crea-
tion of several kinds of inferior courts, such as circuit
courts, chancery courts, and probate courts, and it au-
thorizes the clothing of each of such courts with both
original and appellate jurisdiction; but it wisely pro-
vides that all of these inferior courts, whether they be
of constitutional or statutory creation whether clothed
with original or appellate jurisdiction, shall be under
the jurisdiction, "supervision and control" of the Su-
preme Court. This is necessary to preserve uniformity
in the decisions of these inferior courts, and to keep
them within the proper limits of their respective juris-
dictions and powers. Without one common court, su-
preme to all, these courts would of necessity establish
contradictory rules of adjudication, and these contra-
dictions would be final and without remedy; but this

one common, superior, appellate, and revisory jurisdiction tends to prevent or to put an end to this confusion.

Very soon after the Supreme Court of the United States was established, and soon after the President of the United States had appointed the justices to preside over that court, he addressed to them the following letter: "United States, April 3rd, 1790. Gentlemen: I have always been persuaded that the stability and success of the national government, and consequently the happiness of the people of the United States would depend, in a considerable degree, on the interpretation of its laws. In my opinion, therefore, it is important that the judiciary system should not only be independent in its operations, but as perfect as possible in its formation. As you are about to commence your first circuit, and many things may occur in such an unexplored field which it would be useful should be known, I think it proper to acquaint you, that it will be agreeable to me to receive such information and remarks on this subject as you shall from time to time judge it expedient to make. Geo. Washington. The Chief Justice and Associate Justices of the Supreme Court of the United States." The reply to this letter is too long to be here set out, but is in part as follows: "It has long and very naturally been deemed essential to the due administration of justice, that some national court or council should be instituted, or authorized to examine the acts of the ordinary tribunals, and ultimately to affirm or reverse their judgments and decrees; it being important that these tribunals should be confined to the limits of their respective jurisdiction, and that they should uniformly interpret and apply the law in the same sense and manner. The appellate jurisdiction of the Supreme Court enables it to confine inferior courts to their proper limits, to correct their involuntary errors, and, in

general, to provide that justice be administered accurately. impartially, and uniformly. These controlling powers were unavoidably great and extensive, and of such a nature as to render their being combined with other judicial powers in the same persons unadvisable."—2 Story on the Constitution, 401, 402.

It was said by Ellsworth, the second Chief Justice of the United States Supreme Court, in speaking of the jurisdiction and power of that court, in the case of *Wiscart v. Dauchy*, 3 Dall. 321, 1 L. Ed. 619, as follows: "The Constitution, distributing the judicial power of the United States, vests in the Supreme Court an original as well as an appellate jurisdiction. The original jurisdiction, however, is confined to cases affecting ambassadors, other public ministers, and consuls, and those in which a state shall be a party. In all other cases only an appellate jurisdiction is given to the court, and even the appellate jurisdiction is, likewise,' qualified, inasmuch as it is given 'with such exceptions, and under such regulations, as Congress shall make.' Here then is the ground, and the only ground, on which we can sustain an appeal. If Congress has provided no rule to regulate our proceedings, we cannot exercise an appellate jurisdiction; and, if the rule is provided, we cannot depart from it. The question, therefore, on the constitutional point of an appellate jurisdiction, is simply whether Congress has established any rule for regulating its exercise." Chief Justice Marshall, in the famous case of *Marbury v. Madison*, 1 Cranch, 175, 2 L. Ed. 60, in speaking of the power of the court to award mandamus to compel Mr. Madison, who was then Secretary of State, to issue and deliver to Mr. Marbury a commission to an office to which he had been appointed by the President of the United States, said: "To enable this court, then, to issue a mandamus, it

[Ex Parte Louisville & Nashville R. R. Company.]

must be shown to be an exercise of appellate jurisdiction, or to be necessary to enable them to exercise appellate jurisdiction. It has been stated at the bar that the appellate jurisdiction may be exercised in a variety of forms, and, that if it be the will of the Legislature that a mandamus should be used for that purpose that will must be obeyed. This is true, yet the jurisdiction must be appellate, not original. It is the essential criterion of appellate jurisdiction that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper is in effect the same as to sustain an original action for that paper, and therefore seems not to belong to appellate, but to original, jurisdiction. Neither is it necessary to enable the court to exercise in such a case as this its appellate jurisdiction. The authority, therefore, given to the Supreme Court by the act establishing the judicial courts of the United States to issue writs of mandamus to public officers appears not to be warranted by the Constitution."

While the provision in our Constitution is, of course, somewhat different from the corresponding provision in the Constitution of the United States, yet it has been frequently held by this court that our Constitution was in a measure modeled after that of the United States, and the decisions of the Supreme Court of the United States construing provisions of that Constitution have been largely followed by state courts in construing similar provisions in their Constitutions. I understand the meaning of our Constitution, as to the jursdiction and powers of the Supreme Court, to be as follows: That the Supreme Court shall have no original jurisdiction except in the particular cases expressly provided for in

the Constitution itself. Among the cases, if not the
only cases wherein such original jurisdiction is con-
ferred, are those of impeachment of certain officers, des-
ignated in the Constitution, power to institute and pros-
ecute proceedings in which is vested in this court. The
jurisdiction in such case is both original and conclusive.
The Constitution provides, however, that the Supreme
Court shall have appellate jurisdiction coextensive with
the state, except where jurisdiction over appeals is vest-
ed in some inferior court and made final therein. Such
a court is the Court of Appeals which was established
by the last session of the Legislature.

This court, in line with the Supreme Court of the
United States, has frenquently decided that the Legis-
lature may control the appellate jurisdiction, but not
the original jurisdiction, of the Supreme Court. The
original jurisdiction is, and can be, conferred alone by
the Constitution; but the right of appeal being a statu-
tory right can be conferred or taken away by statute,
and hence the right to an appeal to the Supreme Court
is by the Constitution itself placed under the restric-
tions and regulations of the Legislature, which however,
must not be repugnant to the Constitution. Our Con-
stitution, however, contains a provision not found in the
federal Constitution, being in form a proviso to section
140, which confers both original and appellate jurisdic-
tion, and which authorizes the creation of other appellate
courts, whose judgments and decisions are made final.
This proviso unquestionably relates both to the powers
and to the jurisdiction of the Supreme Court, and to
those of such appellate courts as may be created under
this provision of the Constitution. This proviso reads
as follows: "Provided, that the Supreme Court shall
have power to issue writs of injunction, habeas corpus,
quo warranto, and such other remedial and original

[Ex Parte Louisville & Nashville R. R. Company.]

writs as may be necessary to give it a general superintendence and control of inferior jurisdictions." I take it that there can be no doubt that by this provision it was the intention of the Constitution makers to confer upon the Supreme Court powers which cannot be taken away by the Legislature. There is, however, some conflict in the decisions of this court as to whether this provision confers original, or appellate, jurisdiction. The same conflict occurs in the decisions of courts of other states as to corresponding provisions in their respective Constitutions. Many of these decisions are referred to in a note in 51 L. R. A. pp. 1-100.

To my mind, it is wholly immaterial whether it be considered as conferring original, or appellate, jurisdiction. The proviso declares it is for the purpose only of giving the Supreme Court the power, by means of these common-law writs, whether they be original or remedial, to superintend and control inferior jurisdictions. The power of superintendence and control being thus conferred by the Constitution itself, the means and mode by which it is to be exercised of necessity resides within the discretion of the court. Under this proviso of the Constitution, my opinion is that if every statute of this referring to or regulating the rights of appeal to the Supreme Court to the Court of Appeals, or to any other court, should be repealed or wiped off the statute books, this court would still have the power to revise, superintend, and control the judgments and decisions of all inferior courts, including the Court of Appeals. I can see no reason why this court, under this proviso, has not the same power, the same right, and the same duty to superintend and control the judgments and decisions of the Court of Appeals that it has to control the judgments and decisions of the circuit, chancery, and other inferior courts. But this court　·

has uniformly held that it will not exercise the power conferred under this proviso as to judgments or proceedings in inferior courts where adequate remedy has been otherwise provided, as by appeal to this court, or to some other court, unless such other court fails or refuses to grant the relief and remedy which the law allows. On the other hand, in the absence of any statutory right of appeal, this court has uniformly granted relief by the exercise of the power conferred by this provision of the Constitution. Consequently, as the statute creating the Court of Appeals very properly (as is authorized by the Constitution) provides for no appeal or writ of error (except on one condition) from the judgments and decisions of that court, resort must be had to the proviso for all remedies and relief against such judgments and decisions. While both the Constitution authorizing the creation of this court, and the statute creating it, provide that its judgments and decisions shall be final, it does not follow that such judgments and decisions are not subject to the superintendence and control of the Supreme Court, under this proviso, for the reason that this court never did, and never will, exercise that power, unless the judgment or order sought to be revised is final. It is the finality alone of the judgment, decree, or order from which relief is sought that can call into exercise the powers conferred by the proviso.

In my opinion a different conclusion cannot be reached without disregarding both the letter and the spirit of the Constitution and the statute. Judgments, decrees, and decisions of the Court of Appeals are no more final than the final judgments or decrees of the circuit, chancery, or other inferior court, in the absence of a statute authorizing an appeal from or review of such judgments or decisions. Consequently it is clear that

this court has the same jurisdiction and the same power to superintend and control the judgments, decrees, and decisions of the Court of Appeals (no more, no less) that it has to superintend and control the decrees and judgments of the circuit and chancery courts, in the absence of statutes providing for appeals from or revisions of such judgments. If the Supreme Court cannot award a common-law writ of certiorari to the Court of Appeals to revise its judgments and decrees, then it cannot, for the same reason, award the like writs to the circuit, chancery, and other inferior courts. A construction of the Constitution which will limit or restrict the powers of the Supreme Court to revise, superintend, or control the judgments and decrees of the Court of Appeals must, for the same reason, restrict or limit the powers of the Supreme Court to revise, superintend, or control the judgments and decrees of other inferior courts, in the absence of statutes providing for appeals from, and revisions of, such judgments and decrees.

It is admitted by all that the common law of England, together with the English statutes in operation at the time of the emigration of our ancestors to America, became operative and of force in our institutions, provided such laws and statutes were not inconsistent with our governmental system. Hence the common law of England, and such statutory laws, constitute a part of the common law of Alabama, and are in force, and have always been in force, here, unless repealed by our Constitutions and statutes. Therefore the common law of England and the statutory laws referred to form the source of our common law, and in a large measure form the models after which our Constitutions, institutions, and statutes are formed. It is, I think, beyond doubt that it was the purpose of our Constitution makers, in establishing the Supreme Court of Alabama, to confer

upon it the same corresponding and relative powers that the Court of the King's Bench of England had with regard to the inferior English courts. It was therefore the object and purpose of section 140 of the Constitution to confer upon the Supreme Court of Alabama the same supervisory control over the inferior courts, whether of constitutional or of statutory creation, which the Court of the King's Bench exercised over the inferior English courts. It was the evident purpose of the Constitution makers in placing this proviso, to prevent the Legislature from conferring this supervisory control upon any other court that it might create. This is made evident by reason of the fact that the proviso directs that the Supreme Court shall have power to issue writs of injunction, habeas corpus, quo warranto, and such other original and remedial writs as may be necessary to give it a general supervision and control of all inferior jurisdictions. These writs mentioned specifically and referred to as a class under the English law were denominated prerogative writs, sometimes "crown offices," and sometimes "flowers of the crown." The phrases, "supervision and control," "supervisory control," and "superintending control," have come down to us from the English decisions, and from Colonial charters, and have thus become a part of our Constitutions. By the English law the Court of the King's Bench had jurisdiction to correct all manner of errors of all the judges and justices of the realm in their judgments, process, and proceedings in courts of record, as well as in all other judicial proceedings, and even those which were extrajudicial, which tended to a breach of the peace, oppression of the subject or other manner of misgovernment. By this means it was intended that no wrong or injury, public or private, could be done, which could

not be reformed or punished in one court or another by due process of law.

Such, I believe, was the purpose and intention of the proviso of our Constitution, now under consideration, and which distinguishes it from the Constitution of the United States. In England these prerogative writs could be issued only by the King's bench, which court had jurisdiction and power to keep all inferior courts within the bounds of their authority, and to this end it could remove their proceedings to the King's Bench for determination or prohibit their further progress in the inferior court. It superintended all civil and criminal proceedings. It commanded magistrates and others to do that which their duty required, where there was no other specific remedy. It was thus said to protect the liberty of the subject by a speedy and summary interposition. It issued these prerogative writs in the name of the king, and from the Court of the King's Bench, to enforce obedience to the acts of Parliament and to the King's Charter. These writs were called prerogative writs to distinguish them from ordinary writs which belonged to all courts of justice. They were not originally considered as judicial proceedings, but were exercised as prerogative powers. The Court of the King's Bench, therefore, not only had power in judicial things, but in some things which were extrajudicial. According to the theory of the English Constitution, the king is the fountain of all justice, and, where the laws do not afford a remedy enabling the subject to obtain his rights by ordinary forms of judicial proceedings, these prerogative writs and the powers of the sovereign were brought into play in order to aid the regular judicial powers to attain and preserve the law. While the king does not now sit in these courts in person, yet, in his sovereign capacity, he is still there

in the contemplation of the law, so far as to enable the court to exercise these prerogative powers which reside in the king alone, and can be exercised only in his name. Under the English law this power to issue such writs was not incident to any court which did not possess the general superintending power, but only to a court in which the sovereign himself might, by construction of law, be supposed to sit and exercise these prerogative powers, in aid of the court, in order that no right might be without a remedy.

It is certain, therefore, that it was both the purpose and the effect of this proviso of our Constitution to vest in the Supreme Court these prerogative powers which were exercised, and could be exercised, only by the Court of the King's Bench. While our Constitution and statutes authorize other courts to issue some, if not all, of these prerogative writs, the Constitution was careful to guard this grant of power by the proviso in question, that the Supreme Court should ever have the power finally to issue any or all of these writs, whether original or remedial, if necessary to give it a general superintendence and control over all inferior jurisdictions. It was therefore the object and purpose of this proviso that the one Supreme Court established by the Constitution should have a superintending power, jurisdiction, and control over all inferior courts or jurisdictions, and that, by virtue of this proviso, it could issue all these writs mentioned, or others of like kind and character, and thus supply a remedy when the ordinary forms of statutory proceedings were inadequate to the attainment of uniform justice in matters of public or private concern.

It is contended by some that, as the Constitution expressly authorizes the Legislature to create inferior appellate jurisdiction in certain cases, this prevents, and

was intended to prevent, the Supreme Court from controlling, superintending, or revising the judgments, decrees, or proceedings of the Courts of Appeals so created. The complete and conclusive answer to this contention is that the proviso.in question immediately follows the clause which authorizes the creation of such courts with final appellate jurisdiction. If the proviso does not apply to this inferior appellate court the jurisdiction of which is made final, it cannot apply to any other inferior court more remotely mentioned in the Constitution. The fact that the appellate jurisdiction of the Court of. Appeals is made final tends rather to show that it is within, than without, the proviso, for the reason that the Supreme Court will never exercise the power conferred by the proviso, if any other power or remedy is obtainable in this, or any other, court. The judgment, decree, order, or action against which relief is sought must be final, beyond correction or remedy, by appeal or any other process or power of this or any other court, save the power vested in the Supreme Court by virtue of the proviso. To illustrate: The act creating the Court of Appeals provides that in case the constitutionality of a statute is assailed, and the statute is upheld by that court, the party assailing the constitutionality of the statute can have the decision reviewed in this court by a writ of error. In this particular case the statute provides a mode of review, and it is therefore not necessary to resort to the proviso for power to review, revise, or superintend the decision of the Court of Appeals therein. If an appeal or writ of error was. allowed by statute as to all judgments, decisions, and actions of the Court of Appeals, then the proviso of the Constitution would not apply to it, because not necessary to give this court the superintendence and control of its proceedings. It is the lack of any other remedy or relief

against errors of this appellate court which calls into exercise the powers conferred by the proviso· of the Constitution.

.. I cannot concur in the conclusion that the extent of the power of this court to superintend and control the proceedings in the appellate court is mandamus, to start it, and prohibition, to stop it, and to supervise it only when it decides contrary to former decisions of this court. Neither the Constitution nor reason fixes any such limitations. This court has the same constitutional power to superintend and control the Court of Appeals that it has to control any other inferior court, no more and no less. The Constitution confers the power and it makes no exceptions. No court is presumed to make laws, but to construe them; and, if the inferior appellate court should construe a law erroneously, the duty and the power of this court would be equally as great to correct this wrongful decision, whether the question had never theretofore been decided by this court or whether it had been repeatedly decided. It is both illogical and unreasonable to say that citizens may be deprived of their rights and property contrary to the law, unless the questions of law by which they are so deprived have been decided by this court; and yet concede them no right to have those questions decided by this court. Such would be the necessary effect of the holding that this court can revise the erroneous decisions of inferior courts only when this court has heretofore decided the same questions.

. An appeal is a creature of the statute, and may be destroyed by the statute; but the power to revise and control inferior courts is conferred by the Constitution, and hence cannot be taken away by the Legislature. An appeal is the continuation, in an appellate court, of a proceeding begun in a nisi prius court. A writ of

certiorari, prohibition, etc., is the institution of a new suit in a superior court, but for the purpose of revising and controlling the judgment or decision of some inferior court, jurisdiction, or tribunal. Appeal had its origin in the civil law, while these other writs mentioned in the proviso under discussion had their origin in the common law. It has always been a rule of both English and American law that courts will never issue any of these writs, whether original or remedial, if there is any other adequate and expedient remedy by appeal or otherwise. They have always been treated as dernier resorts, and so have they been treated by this court in construing this proviso of the Constitution. This court has always declined to issue any of these writs if the relief sought could be obtained by appeal or resort to any other inferior court until such inferior court had failed or refused to award the relief allowed by law. The Constitution has thus placed that part of the sovereign prerogative of the states within the power and discretion of the Supreme Court which it has established.

It is true that the reasons for the exclusive jurisdiction to issue these prerogative writs in the Court of the King's Bench do not exist under our American form of government; and hence, if the power resides in one court alone, it is because the Constitution will not allow it to be placed elsewhere. Our Constitution has not reposed in the Supreme Court the sole power to issue these writs, but has authorized other courts to issue them, and contains no inhibition against the Legislature's creating inferior courts with authority to issue such writs; but by means of this proviso it does provide that the Supreme Court alone by means of such writs shall have a general superintendence and control over all inferior jurisdictions, not only as to the issuance

of such writs, but as to any other judicial proceeding. Acting under these provisions, this court has uniformly held, when its attention was directed specially to the proviso, that it would not issue the writs in relation to matters of which any other court had jurisdiction, except when necessary to give it a general supervision and control of some inferior jurisdiction, and that it would not award the writ for the purpose of coercing action by the clerk or officer of the inferior court, when there existed an appropriate remedy by application to some other court, and that this being a case within the supervisory jurisdiction of the court, by virtue of the proviso, it must be shown whether that court or a judge of some court invested with authority to act in the premises had decided erroneously upon the case presented, or had without just cause refused to act in the premises.

There is a long line of these cases, beginning with the first of our reported cases among which are those appearing in *State v. Flinn*, Minor, 8; *Ex parte Simonton*, 9 Port. 383; *Ex parte Mansony*, 1 Ala. 98; *State ex rel. Attorney General v. Williams*, 1 Ala. 342; *Ex parte Floyd*, 40 Ala. 116; *Ex parte Pearson*, 76 Ala. 521; *Ex parte Grant*, 6 Ala. 91; *State ex rel. Attorney General v. Porter*, 1 Ala. 688; *Ex parte Pickett*, 24 Ala. 91. Many others are shown by annotations to section 5955 of the Code, which is the statute attempting to define the jurisdiction conferred upon the Supreme Court by virtue of the Constitution and the statutes. It is true that there are sporadic cases which may be found in the reports of the decisions of this court, and which are referred to in the Digest and in the annotations to the section of the Code mentioned, in which this court has in some cases issued these extraordinary writs to inferior courts or to the officers thereof, when a similar power has been vested, by the Constitution and the stat-

utes, in some other inferior court, such as the circuit court or the chancery court, without first applying to such inferior court; but it has been repeatedly pointed out by this court that such judgments and decisions passed sub silentio, without the attention of the court being called to the point. The truth is that the court has the power to issue such writs in all cases to any inferior court, but the court has correctly decided and determined that it will not do so, if the party can obtain the relief sought by application to some other court, thus conforming, as far as may be, to the provision of the Constitution that the jurisdiction of this court shall be appellate only—that is, revisory—except in cases otherwise directed in the Constitution.

There is no doubt in my mind—in fact, this court has so decided—that the court does have the inherent power, under the proviso, to issue these original writs to any inferior court, even to a probate judge or a justice of the peace, although a Circuit court or a chancery court could afford the same relief; but it is eminently proper that the court should not do so if the relief can be had otherwise, thus conforming its jurisdiction and powers to the revision of actions and proceedings of other and inferior jurisdictions.

It must be conceded, however, that there is a conflict in the decisions of this court, as well as in those of other state courts, as to whether this power or jurisdiction exercised by the Supreme Court under the proviso in question is original or appellate. To my mind it is clearly either or both, if necessary to give it the general superintendence and control of inferior jurisdictions. This conflict of decisions may be seen by reference to the various decisions construing this proviso. Two in which the conflict is made very acute are *Ex parte Pickett,* 24 Ala. 91, and *Ex parte Giles,* 133 Ala. 211,

32 South. 167. In the former, through Chilton, C. J., the court said: "We have had some difficulty as respect the jurisdiction of this court of original applications like this (which was to issue a mandamus to compel the speaker of the house of representatives to certify an act to the comptroller of the state treasury); but as the facts set forth in the petition, and which are admitted by the speaker, very clearly show that, if the petitioner have any other remedy, which is questionable, that remedy may be thwarted, we have determined, under the peculiar circumstances of the case, to entertain jurisdiction of the motion." In the case of *Ex parte Giles,* which was an application to issue mandamus to the board of registrars of Montgomery county to compel the board to register the petitioner as an elector, this court, through McClellan, C. J., said: "The Supreme Court has no jurisdiction of the proceeding. It is not appellate jurisdiction that is invoked, and the matter is not within the very limited original jurisdiction of this court 'to issue writs of injunction, etc.' "—quoting from the proviso, and concluding that: "A board of registrars is not one of the 'jurisdictions' which this court may control by original writs. And, if it were, yet it can never be 'necessary' for this court to control such board by any original writ, since whatever writs may under any circumstances be proper or necessary * * * may be and can only be issued by nisi prius courts," etc. Upon an examination of the decisions of this court, it will be found that the jurisdiction exercised by this court under this proviso is often spoken of as appellate or revisory only, and often referred to as original jurisdiction. It is, however, wholly immaterial whether it be classed as original or appellate. Both the power and the jurisdiction are unquestionably granted if necessary to the general superintendence and control of

inferior jurisdictions. Whether original or appellate is important only in case the proceedings should be attempted to be regulated by statute. Then, and then only, would it become important. If the proviso be considered as conferring original jurisdiction, within the meaning of the exception which forms the first sentence in section 140 of the Constitution, reading as follows: "Except in cases otherwise directed in this Constitution, the Supreme Court shall have appellate jurisdiction only, which shall be coextensive with the state"—then, of course, the Legislature could not confer any other or greater jurisdiction or power than is conferred by that proviso; but, if the proviso be considered as conferring appellate jurisdiction only, then it would be by the very terms of the statute, under such restrictions and regulations, not repugnant to the Constitution, as may from time to time be prescribed by law. This court at a very early period, in line with the decisions of the Supreme Court of the United States, in the case of *State v. Flinn*, Minor 9, decided that the Legislature had no power under this provision of the Constitution to direct that an original motion in the Supreme Court could be had against a delinquent tax collector, holding that the case did not come within the exceptions mentioned in the Constitution, and that the act in question, which required the motion to be made before the Supreme Court without directing any original proceeding before any other jurisdiction in order to bring the case to the Supreme Court, was repugnant to the section of the Constitution referred to, and void.

It clearly appears, therefore, that the Legislature may by statute provide and regulate the appellate power of the Supreme Court, which is thus expressly placed under such regulations as are not repugnant to the Constitution itself; but that as to original jurisdiction

it can neither confer, enlarge, nor take away, nor can it curtail or take away, the power or jurisdiction of the Supreme Court to superintend and control all inferior jurisdictions by means of the extraordinary writs included in the proviso of section 140 of the Constituton. That it cannot be taken away by the creation of an appellate court whose jurisdiction over appeals is final would seem to be certain. If this were not so, why should the proviso, as to the superintendence and control of inferior jurisdictions, have followed the clause in the Constitution which authorized the creation of a court of appeals, the jurisdiction of which is made final? If such inferior courts had been intended to be excepted from this proviso, would not the clause of the Constitution authorizing such courts have followed or been made a part of the proviso, rather than that the proviso should follow immediately after the clause conferring the power upon the Legislature to create such appellate courts? It would seem that the relative positions which this clause and this proviso occupy in the Constitution would render it beyond question that the Supreme Court has the same power, no more, no less, to revise the judgments and decrees of such inferior courts, as it would have to revise those of any nisi prius, or other inferior court. Why any distinction should be made between the power of this court, under the Constitution, to superintend and control the proceedings in appellate courts, and the power to revise and control those in other inferior courts, I am wholly unable to understand. It would seem, under the uniform decisions of this court, that the reason for exercising such superintendence and control over the appellate court is rendered stronger by the fact that no appeal is provided for from that court to this court, as in proceedings in the circuit court, chancery court, and other inferior courts. Why

. the extent of this power should be different, or why any different mode of procedure resorted to, in revising the proceedings of the one, than in the other, I am unable to understand, provided the error in each be the same. That there is, and can be, but one Supreme Court in this state, and that the Legislature cannot interfere with, or take away, the constitutional powers and jurisdiction granted to this court, was announced in a very early decision of this court, that of *Lewis v. Lewis,* Minor, 38, which, of course, referred to the Constitution of 1819; and in that case it was said: "If there can be but one Supreme Court of appellate jurisdiction coextensive with the state, all other jurisdictions must be inferior. Any other courts now established, or which can hereafter be established under the Constitution, whether courts of·common law or courts of chancery, are and will be inferior. The concluding clause of the second section [Const. 1819, art. 5] gives to the Supreme Court the power of issuing such remedial and original writs as may be necessary to give it a general superintendence and control over inferior jurisdictions. The convention then intended that this court, however organized, or by whomsoever held, should alone be supreme, that all other jurisdictions in the state should be inferior to it, and that it should generally suprintend, control, and limit them within their proper spheres." This same doctrine was again very clearly, cogently, expressed in the opinion in *Ex parte Candeo,* 48 Ala. 412, as follows: "Under this section of the Constitution [Const. 1865, art. 6], the Legislature may impose such restrictions and regulations, not repugnant to the Constitution, upon the appellate jurisdiction of this court, but it has no power to limit or prescribe the mode and manner in which it must exercise its power to issue the writs therein named, and such other remedial and

[Ex Parte Louisville & Nashville R. R. Company.]

original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions. If they could, the power thus conferred upon this court by the Constitution might be so crippled and embarrassed as to render it worthless for the great and salutary purposes contemplated by the Constitution. This court has the power to adopt its own practice and mode of proceedings, in exercising the powers conferred upon it by the proviso of this section of the Constitution, and to so mold and fashion it, as to fit the exigencies of each particular case."