THOMPSON, Presiding Judge.
The North Alabama Skills Training Consortium, the Central Alabama Skills Training Consortium, and the South Alabama Skills Training Consortium (collectively “the Consortia”) appeal from the denial of their petition for a writ of certiorari. The evidence and record on appeal reveal the following.
I. Procedural History
In June 2005, the employment contracts of nine state employees were not renewed; those employees were: Roberta Ford, Dolores Ibarra, John McGowin, Angela Mullins, Robyn Stinson, Dawn Thorn, Emuel Todd, Annette Rea, and Gloria Watkins. In July 2005, eight of those employees— Ford, Ibarra, McGowin, Mullins, Stinson, Thorn, Todd, and Watkins (collectively “the employees”) — filed direct appeals with the attorney general’s office, purportedly pursuant to the Fair Dismissal Act (“FDA”), § 36-26-100 et seq., Ala.Code 1975.[1] See § 36-26-115, Ala.Code 1975. The employees alleged that their respective employers had violated the FDA, specifically §§ 36-26-102 through -104, Ala. Code 1975, by terminating their employment without notice and a hearing.[2]
Ibarra, Thorn, and Todd identified Be-vill State Community College (“Bevill State”) as the respondent in their appeals. Bevill State responded, denied any employment relationship with Ibarra, Thorn, and Todd, and asserted that Ibarra, Thorn, and Todd were instead employed by the North Alabama Skills Training Consortium (“NASTC”). Bevill State denied that the NASTC was one of its divisions or departments, and it denied that the FDA governed Ibarra’s, Thorn’s, and Todd’s employment.
Ford and Watkins identified Southern Union State Community College (“Southern Union”) as the respondent in their appeals. Southern Union responded, denied any employment relationship with Ford and Watkins, and asserted that Ford and Watkins were instead employed by the Central Alabama Skills Training Consortium (“CASTC”). Southern Union denied that the CASTC was one of its divisions or departments, and it denied that the FDA governed Ford’s and Watkins’s employment.
McGowin, Mullins, and Stinson identified Bishop State Community College (“Bishop State”) as the respondent in their appeals. They each purported to appeal individually and on behalf of all similarly situated employees. The South Alabama Skills Training Consortium (“SASTC”) responded, stating that it had been incorrectly identified as “Bishop State.” The SASTC asserted that it, and not Bishop State, had employed McGowin, Mullins, and Stinson. The SASTC denied that it was a part of Bishop State, and it denied that the FDA applied to McGowin’s, Mullins’s, and Stinson’s employment.
The Consortia subsequently filed a joint motion to dismiss the employees’ appeals, *313 asserting that the employees were not governed by the FDA and, therefore, that an administrative law judge (“ALJ”) lacked jurisdiction to consider the appeals. Each consortium stated that it had been incorrectly identified by the employees. Bevill State, Southern Union, and Bishop State (collectively “the colleges”) made no further filings in the action. The eight appeals were assigned to an ALJ and consolidated. The ALJ received briefs and documentary evidence, but he did not hold a hearing.
On May 24, 2006, the ALJ issued a 43-page report and recommendation in which he found that the Consortia were departments within the colleges, that the employees were employed by the colleges, and that the colleges operated “under the control, authority, and auspices of the Alabama College System.” The ALJ concluded that the FDA applied to the employees and that the employees had been wrongfully denied notice and hearings as to the discontinuation of their employment. The ALJ ordered as follows:
“2. ... [T]he actions of the two-year colleges are hereby rescinded, and the [employees] are entitled to:
“a. The rights and privileges of the FDA, including their right to a hearing prior to their termination.
“b. Proper notice per the FDA.
“c. Reinstatement and back pay.
“3. The [colleges] are hereby placed on notice that any further employment action on their part must be in full compliance with the FDA.”
The ALJ also ordered that “all of the [colleges’] employees who are situated as are the Petitioners in the case sub judice[ ] are subject to the FDA.”
On June 23, 2006, the Consortia filed in the Montgomery Circuit Court a petition for a writ of certiorari and a motion to stay enforcement of the ALJ’s order. The employees moved to dismiss the petition, arguing, among other things, that because the ALJ’s order was final under § 36-26-115, Ala.Code 1975, the Consortia had no right to appeal or petition for certiorari review. The employees also argued that the Consortia lacked standing and were not proper parties under Rule 17, Ala. R. Civ. P. The circuit court granted the motion to stay.
On December 18, 2006, while the petition for certiorari review was pending before the circuit court, Rea filed a direct appeal with the attorney general’s office, citing § 36-26-115 and the ALJ’s May 24, 2006, order. Rea’s appeal named Bevill State as a respondent. The NASTC responded, alleged that it had been incorrectly identified as Bevill State, and asserted that Rea’s appeal was untimely and that the FDA did not apply to Rea. On February 13, 2007, relying almost entirely on the “similarly situated” language of the May 24, 2006, order, the ALJ found that the FDA applied to Rea and stated that “the conclusion/holding rendered in the [May 24, 2006, order] applies, in toto, to the case here at bar.” The NASTC filed in the Montgomery Circuit Court a petition for a writ of certiorari and a motion to stay enforcement of the ALJ’s decision. Rea’s action was not consolidated with that of the other employees.
The circuit court held a short hearing, and subsequently it issued an order on May 8, 2007. The circuit court’s order denied the petitions for the writ of certio-rari and granted the motions to dismiss in Rea’s action and in the employees’ action. The circuit court also stated:
“[T]he court agrees with all of the conclusions made by the Administrative Law Judge in his May 24, 2006, order in the underlying administrative proceeding in this case and with his February *314 IB, 2007, order in the underlying administrative proceeding in the Rea case. ... The court therefore affirms and incorporates the entire order from the underlying administrative proceedings issued by the Administrative Law Judge on May 24, 2006.”
The Consortia filed a notice of appeal to this court on June 7, 2007, in the employees’ action and in Rea’s action; the circuit court granted a stay of enforcement of the ALJ’s order pending resolution of this appeal. The case was subsequently submitted to this court, which heard oral argument on April 17, 2008.
II. The Fair Dismissal Act
“The purpose of the FDA ‘is to provide non-teacher employees a fair and swift resolution of proposed employment terminations,’ and the FDA should be liberally construed to effectuate its purpose.” Gainous v. Tibbets, 672 So.2d 800, 803 (Ala.Civ.App.l995)(quoting Bolton v. Board of Sch. Comm’rs of Mobile County, 514 So.2d 820, 824 (Ala.1987)). The portions of the FDA relevant to this case are discussed below.
Section 36-26-100, Ala.Code 1975, defines the term “employees” as used in the FDA and thus establishes the requirements individuals must satisfy in order to be governed by the FDA. That section states:
“The term ‘employees,’ as used in this article, is deemed to mean and include all persons employed by county and city boards of education, two-year educational institutions under the control and auspices of the State Board of Education ..., who are so employed by any of these employers as bus drivers, lunchroom or cafeteria workers, maids and janitors, custodians, maintenance personnel, secretaries and clerical assistants, full-time instructors as defined by
the State Board of Education, supervisors, and all other persons not otherwise certified by the State Board of Education. Only full-time employees who are not otherwise covered by the state Merit System or the teacher tenure law at the time this article is adopted are intended to be covered by this article. Full-time employees include ... employees whose duties require 20 or more hours in each normal working week of the school term, employing board holidays excepted.”
Section 36 — 26—101(a) of the FDA states: “All employees ... shall be deemed employed on a probationary status for a period not to exceed three years from the date of his or her initial employment, or a lesser period which may be fixed by the employing authority.” Under § 36-26-102, an employee who has completed the probationary period “shall thereafter not be terminated except for failure to perform his or her duties in a satisfactory manner ... or other good and just causes .... ” Sections 36-26-103 and -104 require specific procedures for the termination of employment of nonprobationary employees under § 36-26-102, including notice to the employee of the proposed termination, a determination by the employing board that the termination should occur, and a hearing upon the employee’s request. It is pursuant to these provisions that Rea and the other employees maintain they were entitled to notice and a hearing.
Section 36-26-115 of the FDA states:
“An employee who has attained non-probationary status and has been denied a hearing before the local board of education ... shall have the right to appeal directly to the Chief Administrative Law Judge of the Office of Administrative Hearings, Division of Administrative Law Judges, Office of the Attorney General for relief.”
*315 Section 36-26-115 grants the ALJ handling the appeal the authority to: “(1) [ojrder a hearing before the local board, (2) determine that the employee has been transferred, suspended, or dismissed in violation of the law and rescind the action taken by the local board, or (3) sustain the action taken by the local board.” Section 36-26-115 also states: “Action taken by the Administrative Law Judge under this section shall be final.”
III. Issues
In their briefs on appeal, the parties identify several issues, at least three of which are jurisdictional in nature. First, the employees argue that the common-law writ of certiorari is not available as a means of judicial review of an ALJ’s decision under § 36-26-115 of the FDA. Second, the employees argue that the Consortia lack standing to appeal because the colleges, not the Consortia, were the named respondents in their direct appeals and the Consortia never properly intervened in the actions. Third, the Consortia argue that the ALJ did not obtain jurisdiction under § 36-26-115 because the employees were not governed by the FDA. This issue is closely intertwined with the Consortia’s primary substantive issue on appeal: whether the FDA applies to the employees and affords them the right to notice and a hearing upon the termination of their employment. The parties also dispute whether the ALJ exceeded his authority by applying his ruling to all similarly situated employees and whether Rea’s action is untimely.
IV. Facts
The evidence contained in the record on appeal reveals the following facts about the creation, practices, and procedures of the Consortia, the Consortia’s relationship with the colleges, and the general employment history of the employees. In 1998, the United States Congress enacted the Workforce Investment Act of 1998 (“WIA”), 29 U.S.C. § 2801 et seq., which superseded the Job Training Partnership Act, 29 U.S.C. § 1501 et seq. The WIA provides federal funding for eligible state programs that deliver workforce education and skills training to qualifying adults and at-risk youth. For administrative purposes, the WIA system divides Alabama into three local service areas; each local service area is governed by a local workforce-investment-area board. According to the record, federal funding under the WIA flows from the United States government to the governor, then to the Alabama Department of Economic and Community Affairs (“ADECA”), then to the local workforce-investment-area boards, and finally to workforce-training service providers within what is known under the WIA as the “one-stop delivery system.” The record shows that the one-stop delivery system is a network of service providers, designated by either ADECA or the local workforce-investment-area board, that cooperate within a local workforce-investment area.
Before the enactment of the WIA, entities known respectively as the North Alabama Skills Center, the Central Alabama Skills Center, and the South Alabama Skills Center (collectively “the Skills Centers”) provided workforce education and skills training under the federal Job Training Partnership Act. Certain services provided by the Skills Centers were offered through a program known as “Career-Link.” It is undisputed that, before 2001, the employees were employed by the Skills Centers within the CareerLink program, either as instructors or as facilitators. After the WIA was enacted, several programs offered by the Skills Centers were discontinued; however, the CareerLink *316 program was continued under the authority of the Consortia.
In May 1997, before the enactment of the WIA, the Alabama Board of Education created the Task Force for Effectiveness Planning in Postsecondary Education (“the Task Force”). The Board of Education charged the Task Force with evaluating the two-year college system and making recommendations regarding how the Alabama College System (“the College System”) should be restructured in order to enhance the delivery of its services. On May 27, 1999, the Chancellor of the Department of Postsecondary Education (“the Chancellor”) issued a report to the Board of Education regarding the recommendations of the Task Force. That document, entitled “Recommendations of the Chancellor to the Alabama State Board of Education for the Implementation of the Report of the Task Force for Effectiveness Planning in Postsecondary Education” (“the Recommendations”), contained both the recommendations of the Task Force and those of the Chancellor.[3]
The Recommendations do not mention the Consortia by name. The Chancellor’s Recommendation 1.4 states:
“It is recommended that ... [the College System] Institutions establish an Adult Education and Skills Training Division at each college to offer adult education and family literacy courses and to offer skills training services and courses currently handled by the Alabama Skills Centers.”
Exhibit 1 to this recommendation refers to “Alabama’s public, two-year colleges [as] the premiere deliverer of workforce training” and states that “it logically falls to the two-year colleges to carry out the job skills training heretofore provided by the Alabama Skills Centers.” The exhibit includes a chart that shows the proposed Adult Education and Skills Training Divisions (“the Skills Training Divisions”) directly under the authority of the two-year colleges. The chart states: “Individuals employed in the [Skills Training] Division would earn tenure on the same basis as other college employees and would be paid on a separate [Skills Training Division] Salary Schedule.”
Recommendation 7 of the Task Force advises, in part, that the Board of Education oversee workforce-development programs that utilize the two-year colleges as one-stop training centers. Recommendation 7 also refers to the College System as “the presumptive deliverer of workforce training.”
Recommendation 8 of the Task Force advises that “the State Board [of Education] institute contracting and abolish tenure for all new hires under the workforce budget to establish the flexibility required of the community college system to respond to a dynamic economy. Current employees should keep their tenure.” The Chancellor’s Recommendation 8.1 advised that the College System “institutions work within existing law to hire full- and part-time employees to staff local workforce training needs.” The Chancellor’s rationale states: “Appropriate and timely evaluations of those working more than 20 hours per week will result in institutions retaining only those employees who meet local workforce training requirements.”
The Chancellor’s Recommendation for Action noted that fiscal considerations were unknown but that funding could be obtained from a variety of sources, including under the WIA. The Recommendations *317 were approved by the Board of Education on May 27,1999.[4]
On April 18, 2001, the Chancellor sent a memorandum to Skills Center employees, apparently to offset speculation regarding the status of the Skills Centers. The Chancellor stated:
“[W]e are moving forward with the implementation of [Skills Training Divisions] in the [College System]. To facilitate and coordinate that effort, we are realigning the ... Skills Centers and locating them within ... Consortia under the direction of several colleges in the [College System]. The reconfiguration appears below.
“• North Alabama Skills Training Consortium operated by Bevill State Community College.
“• Central Alabama Skills Training Consortium operated by Southern Union State Community College.
“• South Alabama Skills Training Consortium operated by Bishop State Community College.
[[Image here]]
“This is simply an administrative change regarding the reporting line for the Skills Centers. Rather than reporting directly to the Chancellor, the Skills Centers Directors will report to the President of the managing institutions. You will continue to report to the Directors of the Skills Centers and current operations and functions will continue.”
On October 9, 2001, the Department of Postsecondary Education (“Postsecond-ary”) and ADECA entered into an agreement regarding the implementation of the WIA. The agreement required Postsecond-ary to create the Consortia as entities
eligible to deliver training programs approved under the WIA. In relevant part, the agreement states:
“Each of the Consortia will employ up to one director, one bookkeeper, one secretary, and one training coordinator, or ADECA and [Postsecondary] and its colleges may enter into contracts to provide necessary services for the consortia.®[5] ... The aforementioned employees will be paid according to the existing salary schedule and paid with WIA funds. ADECA and [Postsecondary] must mutually agree upon any employment and salary changes.
“As stated in [the Recommendations] each [Postsecondary] college will create a new [Skills Training Division],
“The WIA Board will no longer fund current Skills Centers classes ....
“Skills Centers will no longer enroll students.
[[Image here]]
“In order to properly reach its intended audience, CareerLink staff previously located at a Skills Center will co-locate to the nearest One-Stop Career Center where appropriate and mutually agreed upon by ADECA and [Postsecondary].
“CareerLink activities will be funded through the WIA.
“CareerLink employees will be employed by the Consortia under the existing salary schedule.”
The record contains an undated report entitled “Chancellor’s Report Implementing Recommendation 1.4 of the Task Force for Effectiveness Planning in Postsecond-ary Education as Adopted by the Alabama State Board of Education May 27, 1999” *318 (“the Chancellor’s Report”). This Report outlines the establishment of the Consortia. The Chancellor’s Report states:
“The member institutions of [the College System] will form five distinct skills training consortia[6] for the purpose of improving the coordination and provision of non-traditional, non-credit, short-term, on-demand training and transition services, to include those activities and services once independently provided by what have been known as the Alabama Skills Centers.”
Pursuant to the Chancellor’s Report, under the direction of the Consortia, certain services provided by the Skills Centers would be continued “consistent with available funding and stipulations” noted in the Report.
Regarding the organization of the NASTC, the Chancellor’s Report stated:
“The current director of the entity now known as the North Alabama Skills Center will become the employee of Be-vill State Community College as the director of the North Alabama Skills Training Consortium, and the current director and administrative staff of what has been known as the North Alabama Skills Center will be located on the campus of Bevill State Community College in their new capacity as the director and staff of the North Alabama Skills Training Consortium, and Bevill State Community College will become the fiscal agent for the North Alabama Skills Training Consortium.
[[Image here]]
“A representative from each college serving the counties designated as service counties of the North Alabama Skills Training Consortium will constitute the North Alabama Skills Training Consortium board of directors to be convened by the president of the institution serving as the fiscal agent and the employing entity of the director, to consider an agenda approved by the president of the institution serving as the fiscal agent and the employing entity of the director, according to the bylaws appropriately adopted by the consortium board of directors.”
The Chancellor’s Report contains correlating statements regarding the CASTC and the SASTC. It also authorized the Consortia “to continue and to enter into agreements ... only by the express approval of the appropriate consortium board of directors and the president of the institution serving as the fiscal agent and the employing entity of the consortium director.” Finally, the Chancellor’s Report states: “From this point forward, the Alabama Skills Centers as they have been recognized will no longer exist .... ”
In April 2003, Postsecondary adopted a personnel manual for the Consortia (“the ASTC Personnel Manual”). That document governs the Consortia generally; an individual consortium may add to, but not adopt policies that conflict with, the policies and procedures it sets forth. The ASTC Personnel Manual establishes general policies regarding hiring, employment forms for new employees, guidelines and forms for employee evaluations to be performed by intermediate supervisors, and standards for a 6- to 12-month probationary period for new employees. Pursuant to the ASTC Personnel Manual, hiring decisions are generally made by the consortium’s director, and employee leave is approved by the consortium’s director based on a general leave policy established by *319 the Board of Education. The policies regarding compensatory time are based on rules formulated by the State Personnel Board, the Board of Education, and Post-secondary.
Regarding retirement benefits, the ASTC Personnel Manual states:
“The Skills Training Consortia participate in the Teachers’ Retirement System in Alabama. By law, all employees working twenty (20) or more hours per week in permanent positions must be enrolled in Teachers’ Retirement. The consortium director will determine whether a position is permanent or temporary, but in no case will a position be designated as ‘temporary’ for more than one year.”
Only “teachers” as defined by § 16-25-1(3), Ala.Code 1975, may participate in the Teacher’s Retirement System (“TRS”). §§ 16-25-1(6) and 16-25-3(a), Ala.Code 1975. That section defines “teacher” as: “Any teacher, principal, superintendent, supervisor, college professor, administrative officer, or clerk employed in any public school or public college within the state ... or any similar employee or officer of the Department of Education or of the Alabama Education Association .... ” § 16-25-1(3). It is undisputed that the employees participate in the TRS.
Pursuant to the ASTC Personnel Manual, Consortia employees have group health-insurance coverage through the Public Education Employees Health Insurance Program (“PEEHIP”). Generally, only persons “employed full-time in [the] public institution^] of education within the State of Alabama which provide[ ] instruction at any combination of grades K through 14, exclusively, under the auspices of the State Board of Education” may participate in PEEHIP. § 16-25A-K1), Ala.Code 1975. Section 16-25A-11, Ala.Code 1975, provides that TRS participants, whose employers comply with certain requirements, may also participate in PEEHIP. It is undisputed that the employees participate in PEEHIP.
Under the ASTC Personnel Manual, most disciplinary measures are to be decided upon and administered by intermediate supervisors; discharge, however, requires the approval of the consortium director and the “lead president,” presumably the lead college/consortium board president. Policy No. 114 of the ASTC Personnel Manual provides Consortia employees the right to challenge disciplinary measures, including termination, through an appeal process for which it provides specific forms. This appeal process takes the dispute first to the consortium director and then to the “lead president” for the consortium. Employees are entitled to a hearing during the appeal process.
Finally, the ASTC Personnel Manual establishes a Reduction in Force (“RIF”) plan for the Consortia, stating:
“Most Skills Training Consortium programs are funded on a year to year basis or for the specific length of a certain project. Most funds are Federal and are obtained through a competitive process from employment and training program sponsors. Since program funding is always an uncertainty, Reduction in Force (RIF) procedures have been developed to allow for an equitable and orderly reduction in staff if such action is warranted.”
Under the RIF plan, implemented by the consortium director, “[o]nce a RIF has been initiated, employees will be notified in writing within fifteen (15) days as to their employment status and any subsequent in-tra-agency transfer options.”
The record contains separate employee handbooks for the NASTC and the *320 SASTC, but not for the CASTC. These handbooks are substantially similar to the ASTC Personnel Manual. The SASTC employee handbook contains an organizational chart that shows its employees to be directly under intermediate supervisors known as either “CareerLink Coordinators” or “Training Coordinators” who, in turn, are under the consortium director, the lead college/consortium board president, the Chancellor, and ultimately the Board of Education. It also notes that instate travel must be authorized by the consortium director and that out-of-state travel must be authorized by the “lead college president.” The NASTC employee handbook states that its employees’ working hours are established by the consortium director.
The record also contains excerpts from the bylaws of the CASTC and the SASTC. The SASTC bylaws state, in part:
“The [SASTC is] ... to be a legally distinct entity, separate and apart from the organization formerly designated the South Alabama Skills Center ...; and legally distinct'and separate from [the College System] or any of the public two-year colleges of Alabama governed by the Alabama State Board of Education commonly included within that title, except as set forth by these BYLAWS and by the provisions of the [Chancellor’s Report].
“... With the exception of the salary of the Director, all funding for the employees and activities of the [SASTC] shall be derived from grants, donations, and bequeaths except as, and unless otherwise provided in individual instances by the Board of Directors, in accordance with the BYLAWS; and all employees shall be on a year-to-year, at-will, employment contract, the continuation of which will be entirely contingent upon the decision of the Board of Directors and the availability of such funds as specified above. With the exception of the Director and any administrative personnel deemed appropriate by the President of [Bishop State], no employee of the [SASTC] is entitled to the rights, benefits, entitlements or prerogatives commonly associated with employment by the public two-year colleges of Alabama, and in fact is not, and cannot be, an employee of the public two-year colleges of Alabama, except as provided by the BYLAWS.
“The membership of the Board of Directors of the [SASTC] shall be the presidents of [the two-year colleges within the SASTC’s service area].
“The officers of the Board of Directors of the [SASTC] shall be a President, a Vice President, and a Secretary. The President shall be the president of the institution serving as the employing agent of the Director of the [SASTC].”
The SASTC bylaws do not define the term “employing agent.” The CASTC bylaws are substantially similar to the SASTC bylaws.
Notably, the record does not contain any information regarding whether the Consortia receive funding from Bevill State, Southern Union, or Bishop State; nor is there any documentation in the record regarding the position of the Consortia within the organizational structure of these colleges. Likewise, other than those documents described above, the record does not contain any documentation of the position of the Consortia within the organizational structure of the Board of Education, Postsecondary, the College System, or the WIA system.
*321 It is undisputed that before 2001 the employees were each employed by the Skills Centers. The record shows that the employees were employed with the Skills Centers pursuant to contracts for a specific term, usually between three months and one year. At the end of June 2002, Ibar-ra’s, Thorn’s, and Todd’s contracts with the North Alabama Skills Center expired, and they entered new contracts with the NASTC beginning on July 1, 2002. Also at that time, Ford’s and Watkins’s contracts with the Central Alabama Skills Center expired, and they entered new contracts with the CASTC. At the end of September 2002, McGowin’s, Mullins’s, and Stinson’s contracts with the South Alabama Skills Center expired, and they entered new contracts with the SASTC beginning on October 1, 2002. The Skills Center contracts and the Consortia contracts appear substantially similar, and, in the case of the NASTC, they are nearly identical.
The employees’ contracts with the Consortia were for specific terms, generally for a year. The contracts contain the following language:
“The Employee understands that he/ she is on non-tenured, non-permanent status for the term of this Agreement and acknowledges that there is no obligation upon the Consortium to renew or extend this Agreement, or the Employee’s employment, beyond the term specified herein, provided that the Consortium shall give the Employee such notice of non-renewal as may be required by the policies, rules or regulations of the Consortium.
“The work load and schedule of each employee shall be determined by the Consortium Director in accordance with the needs of the Consortium. Assignment and/or changes in the assignment will be made by the Consortium Director or his/her authorized designee.
“The Employee understands and agrees that the Consortium is funded by contract and that a discontinuation of sufficient funds available to the Consortium for the subject position shall be grounds for the termination of this Agreement.”
The evidence contained in the record on appeal also includes job-performance reviews for Ford, Ibarra, Thorn, Todd, and Watkins, dated both before and after the transition to the Consortia. The review forms were substantially similar for the Consortia and the Skills Centers.
In June 2005, the employment contracts of the employees expired and were not renewed. The Consortia received a 21% decrease in funding for the program year 2005, which runs from July 1, 2005, through June 30, 2006. As a result of this decrease in funding, the Consortia implemented a RIF as set out in the ASTC Personnel Manual. It is undisputed that, as a result of the RIF, each of the employees was either offered a transfer to a new location or was not offered renewed employment. It is from these employment actions under the RIF that the employees filed their appeals with the ALJ.
The record contains letters from the SASTC director to McGowin, Mullins, and Stinson on SASTC letterhead notifying them of the nonrenewal of their contracts pursuant to the RIF. The SASTC letterhead states that the consortium is “a service project of Bishop State Community College.” Ibarra, Thorn, and Todd were notified of the nonrenewal of their employment under the RIF via letters from the president of Bevill State on Bevill State letterhead. Ford and Watkins received letters notifying them of the nonrenewal of their employment under the RIF from *322 Claude McCartney on Southern Union Skills Training Division letterhead. The letterhead identified McCartney as director of the Skills Training Division; however, in his affidavit McCartney stated that he was director of the CASTC.
It is undisputed that at the time of the RIF each of the employees worked more than 20 hours each week and was not covered by the State Merit System or the teacher tenure law. The employees advised the Consortia in writing that, according to the employees, the termination and transfer notices did not comply with the FDA and that they intended to challenge the nonrenewal of their contracts, purportedly pursuant to the FDA. The Chancellor, the SASTC, and the CASTC director responded separately, each asserting that the FDA did not govern the employees. The responses notified the employees of their right to file a grievance pursuant to Policy No. 114 of the ASTC Personnel Manual; however, it is undisputed that none of the employees utilized the grievance procedure established in Policy No. 114.
The employees maintain that the Consortia are merely extensions of the Skills Centers and departments within the colleges and that, therefore, they are employees of the colleges. In their affidavits, the employees state that they were employed by the colleges, in the CareerLink program, continually for more than three years, in most cases for five or six years. The employees also state that their children were entitled to receive free tuition at two-year colleges within the College System. The employees note in their affidavits that the payers on their paychecks were listed respectively as “North Alabama Skills Training Consortium/Bevill State Community College,” “Central Alabama Skills Training Consortium/Southern Union State Community College,” and
“South Alabama Skills Training Consortium/Bishop State Community College.” The employees admit that their contracts were with the Consortia and were for specified terms; nonetheless, they state that they believe that they were nonprobation-ary employees of the colleges.
Other evidence in the record supports the employees’ assertion, including an official letter by the CASTC director regarding a state audit report that was written on Southern Union Skills Training Division letterhead. Although most employees of the Consortia report to intermediate supervisors, the job descriptions in the record show that the Consortia directors report to the “community college president.” As discussed above, the record shows that the Consortia’s directors are employed by the lead college in their respective consortium; however, the evidence does conflict regarding how the directors were paid. Additionally, the job descriptions show that the Consortia’s accountants must prepare and submit reports to the “College Business Office.” A position announcement regarding the NASTC’s need for a new director states, in relevant part:
“The [NASTC] serves the employment and training needs of dislocated workers and other adults and youths eligible for services under the [WIA] in conjunction with nine two-year colleges whose services areas are located wholly or in part located within the northern third of Alabama. ...
[[Image here]]
“In addition to adhering to the guidelines specified by Bevill State Community College Personnel Handbook and the State Board of Education, duties will include ...:
[[Image here]]
“Serve as the primary liaison between the member colleges of the Consortium,
*323 Career Center offices, and the Consortium President.
[[Image here]]
“Adhere to and enforce all college policies.”
The Consortia maintain that they are independent of both the Skills Centers and any two-year or community college within the College System. The Consortia offer the affidavits of the Vice Chancellor for the Workforce Development and Adult Education Division of Postsecondary, a training coordinator for the NASTC, and the directors of the CASTC and the SASTC to support their assertion. These affidavits state that the Consortia operate independently and are not programs, departments, or divisions of the colleges. The Consortia operate central offices at their respective host colleges and, pursuant to an assignment by Postsecondary, the colleges serve as fiscal agents for the Consortia. As fiscal agents, the colleges oversee the Consortia’s financial transactions as approved by the Consortia’s directors. However, the Consortia’s funds are received, tracked, and paid separately from college funds; they are not commingled. The affidavits state that the Consortia are federally funded pursuant to the WIA and do not receive state funds.
The affidavits also state that the Consortia’s performance standards are set by the United States Department of Labor, not by the colleges or the College System. The affidavits further note that the Consortia are audited independently from the colleges by the Department of Examiners of Public Accounts (“DEPA”), maintain separate salary schedules from the colleges, and have separate federal employer identification numbers. Finally, the affidavits state that Careerlink personnel are employed by the Consortia, not the colleges, and do not work in the Skills Training Divisions of the colleges.
The record contains DEPA audit reports for each consortium. The reports describe the general structure of the Consortia’s boards and note that the lead colleges act as the employing agents for the Consortia’s directors and provide administrative offices for the Consortia. The reports also state that Consortia employees are required by statute to contribute 5% of their income to the TRS. The DEPA report regarding the NASTC states:
“For financial reporting purposes, [the NASTC] is part of the primary government of the State of Alabama. The State of Alabama, through the State Board of Education, governs the Department of Postsecondary Education. The Department of Postsecondary Education, through its Chancellor and the Consortium Board of Directors, has the authority and responsibility for the operation, management, supervision and regulation of [the NASTC].”
The CASTC report contains a similar statement. The DEPA reports regarding the Consortia do not contain any financial information regarding the colleges. Additionally, the record contains 2004 Federal Form W-2, Wage and Tax Statements for Ibarra, Thorn, and Todd listing their employer as the NASTC, and for Ford and Watkins listing their employer as the CASTC.
The Consortia maintain that the ALJ confused the Consortia with the Skills Training Divisions of the colleges, which were created pursuant to the Chancellor’s Recommendation 1.4, discussed above. The Consortia assert that they are independent from the Skills Training Divisions. Specifically, the Consortia highlight the differences between the operations of the Consortia and the Skills Training Divisions and those records that refer to the Consortia and the Skills Training Divisions as separate entities.
*324 The job description in the record regarding the Consortia’s training coordinators states that they are to act as liaisons between the Consortia and the Skills Training Divisions, coordinate activities between them, and attend the meetings of both. The affidavits of the Director of Personnel Services for Bevill State, the President of Southern Union, and the Director of Human Resources of Bishop State describe how the operations of the Skills Training Divisions of their respective colleges are different from those of the Consortia. These affidavits state that the Skills Training Divisions were created in response to the Recommendations and are equipped to provide WIA services. However, the Skills Training Divisions are a part of the colleges’ academic schools and are not audited independently from the colleges as are the Consortia. According to the affidavits, employees of the colleges’ Skills Training Divisions are employed by the colleges and paid with college funds. Unlike the Consortia, their job duties are defined by the colleges.
These affidavits also expressly deny that the employees were ever employed by the colleges generally or in the Skills Training Divisions specifically. The affidavits attach employment documents for existing employees within each college’s Skills Training Division. These documents differ significantly from the employees’ employment documents utilized by the Consortia.
V. Standard of Review
The circuit court’s standard of review of a petition for a common-law writ of certiorari is well settled. On common-law certiorari review, the circuit court’s “scope of review was limited to determining if the [ALJ’s] decision to [reinstate the employees] was supported by legal evidence and if the law had been correctly applied to the facts.” Evans v. City of Huntsville, 580 So.2d 1323, 1325 (Ala.1991). “In addition, the court was responsible for reviewing the record to ensure that the fundamental rights of the parties, including the right to due process, had not been violated.” Id. “Questions of fact or weight or sufficiency of the evidence will not be reviewed on certiorari.” Personnel Bd. of Jefferson County v. Bailey, 475 So.2d 863, 868 (Ala.Civ.App.1985).
“ ‘ “[A] common-law writ of certiorari extends only to questions touching the jurisdiction of the subordinate tribunal and the legality of its proceedings. The appropriate office of the writ is to correct errors of law apparent on the face of the record. Conclusions of fact cannot be reviewed, unless specially authorized by statute. The trial is not de novo but on the record; and the only matter to be determined is the quashing or the affirmation of the proceedings brought up for review.” ’ ”
G.W. v. Dale County Dep’t of Human Res., 939 So.2d 931, 934 n. 4 (Ala.Civ.App.2006) (quoting City of Birmingham v. Southern Bell Tel. & Tel. Co., 203 Ala. 251, 252, 82 So. 519, 520 (1919), quoting in turn Postal Tel. Co. v. Minderhout, 195 Ala. 420, 71 So. 91 (1916)). “This court’s scope of appellate review is the same as that of the circuit court.” Colbert County Bd. of Educ. v. Johnson, 652 So.2d 274, 276 (Ala. Civ.App.1994).[7]
*325 VI. Analysis
A. The Fair Dismissal Act
Although jurisdictional issues typically require resolution before other issues, we find that the jurisdictional issues presented in this case depend upon a determination of whether the FDA applies to the employees. Accordingly, we will consider that issue first.
Under those portions of § 36-26-100 that are relevant to this case, the FDA applies to persons employed by “two-year educational institutions under the control and auspices of the State Board of Education,” who are not certified by the State Board of Education, “who are not otherwise covered by the State Merit System or the teacher tenure law,” and “whose duties require 20 or more hours in each normal working week of the school term .It is undisputed that the employees were not certified by the Board of Education, that they were not covered by the State Merit System or the teacher tenure law, and that they worked more than 20 hours in each normal working week. Accordingly, the determinative question regarding whether the employees were governed by the FDA is whether they were employed by “two-year educational institutions under the control and auspices of the State Board of Education.”
It is undisputed that the Consortia, independent of any relationship with the colleges, are not “two-year educational institutions.” Accordingly, to be governed by the FDA, the employees must have an employment relationship with the colleges. To determine the nature of the relationship between the employees and the colleges, we will look to the general law relative to employment.
In Peterson v. Lowndes County Board of Education, 980 So.2d 975 (Ala.2007),[8] our supreme court reversed a trial court’s summary judgment that had held that employees of a county’s Head Start program were not employees of the county’s board of education and, consequently, were not governed by the FDA. In determining whether the employees were employed by the county’s board of education, the supreme court “considered] general Alabama law pertaining to employment relationships.” 980 So.2d at 977. Specifically, the supreme court in Peterson applied the following rules:
“ ‘ “The general rule is that to constitute the relationship between master and servant for the purpose of fixing liability on the former for the acts of the latter under the doctrine of re-spondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore, something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation.” ’
“[Davenport-Harris Funeral Home, Inc. v. Chandler,] 38 Ala.App. [463,] 466, 88 So.2d [875,] 877 [ (1956) ]. Although the theory of respondeat superior is not presented in this case, we apply the legal test in Chandler in determining whether an employment relationship exists between Peterson and Davis, on the *326 one hand, and the Board, on the other. According to Alabama law, whether Peterson and Davis are considered to be employees of the Board depends upon the extent to which the Board had a right to select and control them while they were employed at Head Start. Chandler, supra.
“It has been long established that to be considered an employer, one must have the authority to select, control, and supervise the employee. Birmingham Post Co. v. Sturgeon, 227 Ala. 162, 149 So. 74 (1933). In Sturgeon this Court examined the workers’ compensation claim of a deceased newsboy, concluding that the Birmingham Post Company neither held nor exercised control over the newsboy necessary to constitute a relationship of employer to employee. In Home Insurance Co. v. Gray don, 335 So.2d 645 (Ala.1976), this Court again discussed the necessity of an employer’s right of control over the purported employee to establish an employment relationship, stating:
“ ‘Generally, whether the injured party was in fact an employee of the insured is to be determined by the master servant relationship, and whether the injured party is an employee of the insured depends upon the particular circumstances of the case. In accordance with this general principle of employment law, the existence of control over the employee is an essential element in determining by whom he is employed.’
“335 So.2d at 647.”
980 So.2d at 977-978.
Based on the specific facts in Peterson, and the determination by a plurality of the court that, pursuant to certain federal regulations, the county’s board of education “had the authority to influence the direction and decisions of Head Start that impacted the daily employment duties and day-to-day activities of its instructors,” the supreme court reversed the trial court’s summary judgment for the board. 980 So.2d at 980. Although the federal regulations that the supreme court found determinative in Peterson have no application in this case, the Peterson opinion is instructive regarding the general law to be considered in determining whether an employment relationship exists for purposes of the FDA.
Additionally, in Lathan Roof America, Inc. v. Hairston, 828 So.2d 262 (Ala.2002), a case involving the Employer’s Liability Act, §§ 25-6-1 to -4, Ala.Code 1975, our supreme court identified several factors to be considered in determining whether an employment relationship exists. The court explained:
“Several factors are relevant in determining whether an individual is an employee of another. Obviously, one of the most important factors is whether there is evidence of an offer of employment and an acceptance of that offer. Another important factor is ‘the degree of control the alleged [employer] retains over the alleged [employee].’ Gossett v. Twin County Cable T.V., Inc., 594 So.2d 635, 639 (Ala.1992) (also stating that “ ‘[i]t is the reserved right of control rather than its actual exercise that furnishes the true test of whether the relation between the parties is that of an independent contractor or of employer and employee — master and servant’ ” (quoting Hodges & Co. v. Albrecht, 288 Ala. 281, 284, 259 So.2d 829, 830 (1972))). Other factors include ‘the method by which one receives payment, the furnishing of equipment, ... and whether one had the right to terminate the employment of the worker.’ Boyd v. Hinkle Roofing & Sheet Metal, Inc., 596 So.2d 947, 949 (Ala.Civ.App.1992). Other fac *327 tors are certainly relevant. For example, the exercise of — or the failure to exercise — prerogatives inherent in the alleged employee status give some indication as to whether a person actually holds (or believes that he or she holds) that status.”
828 So.2d at 265-66. See also Flowers v. Pope, 937 So.2d 61, 65 n. 3 (Ala.2006).
Generally, the existence of an employment relationship is a question of fact for the fact-finder to decide. See Tyson Foods, Inc. v. Stevens, 783 So.2d 804, 808 (Ala.2000) (“Typically, the existence of an agency relationship is a question of fact for a jury to decide.”); Terry ex rel. Terry v. Phillips 66 Co., 591 So.2d 33, 36 n. 1 (Ala.1991) (“a master-servant relationship is a subgroup of principal-agent relationships”).[9] Applying the standard of review stated above, we must determine whether legal evidence supports the ALJ’s finding that an employment relationship existed between the colleges and the employees. Specifically, based on the rules related to the establishment of an employment relationship as discussed in Peterson, we must decide whether the ALJ received legal evidence indicating that the colleges had the right to select and control the employees. Under Lathan, we may also consider evidence relative to the circumstances surrounding the formation of the employees’ employment contracts, the method by which the employees received payment, and the colleges’ right to discharge the employees.
Regarding the related question whether the Consortia were independent entities or departments or programs within the colleges, i.e., agents of the colleges, the right of control is similarly determinative. “The test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent.” Gist v. Vulcan Oil Co., 640 So.2d 940, 942 (Ala.1994); Worthy v. Cyberworks Techs., Inc., 835 So.2d 972, 980 (Ala.2002). Accordingly, we must determine whether the colleges had a right of control over the actions of the Consortia and, thus, of the employees.
The Consortia argue that the employees were not controlled or paid by the colleges. The Consortia point to evidence showing that the Consortia maintained employee handbooks separate from the colleges, that the employees were supervised by the Consortia’s directors and intermediate supervisors, that the employees’ job descriptions were created by the Consortia, and that the employees were paid solely with federal funds received pursuant to the WIA. The Consortia also point to the October 9, 2001, agreement between Postsec-ondary and ADECA, which stated that “CareerLink employees [would] be employed by the Consortia,” and the Consortia’s bylaws, which stated that “no employee of the [Consortia] is entitled to the rights, benefits, entitlements or preroga *328 tives commonly associated with employment by the public two-year colleges of Alabama, and in fact is not, and cannot be, an employee of the public two-year colleges of Alabama.” Additionally, the Consortia note that they were audited separately from the colleges.
However, as stated above, under the proper standard of appellate review our inquiry is not whether the evidence tended to show that the employees were employed by the Consortia or by the colleges. Rather, we must determine whether legal evidence supported the ALJ’s factual finding that employment relationships existed between the employees and the colleges. Regarding that inquiry, the evidence in the record on appeal indicates the following.
The Consortia’s directors are actually employed by their respective host colleges. The directors wield significant authority within the Consortia and control many areas of the employees’ daily work. The Consortia’s directors hired the employees, approved their leave time, approved their in-state travel, and established the employees’ working hours. Appeals in the Consortia grievance process established by Policy No. 114 are taken first to the Consortia’s directors.
The presidents of the colleges also exercised control over the employees. The presidents had the authority and responsibility to approve the employees’ out-of-state travel. The college presidents are the ultimate authority in the Consortia’s grievance process established by Policy No. 114. Additionally, and perhaps most significantly, the college presidents, jointly with the Consortia’s directors, had the authority to discharge the employees.
The record shows that McGowin, Mullins, and Stinson were discharged by the SASTC director via letters on SASTC letterhead that identified the SASTC as “a service project of Bishop State Community College.” Ibarra, Thorn, and Todd were discharged by the president of Bevill State via letters on Bevill State letterhead. Ford and Watkins were discharged by McCartney via letters on Southern Union Skills Training Division letterhead identifying McCartney as the director of the Southern Union Skills Training Division. Additionally, although the employees were paid with federal funds pursuant to the WIA, the colleges managed Consortia funds and issued paychecks to the employees in the name of both the colleges and the Consortia.
The foregoing evidence shows that the colleges, in some manner, actually controlled and retained the right to control the employees’ work activities. The Consortia’s directors, who are college employees, had the authority to select the employees and to discharge them with the approval of the college presidents. The employees were directly supervised by intermediate supervisors, but they were ultimately answerable to the Consortia’s directors and the college presidents. This supervision, as well as the right to select and discharge and the right to control leave time, travel, and work hours, is legal evidence of a right of control sufficient to support the ALJ’s finding that an employment relationship existed between the employees and the colleges.
Furthermore, it is undisputed that the employees participate in the TRS and PEEHIP. Generally, pursuant to §§ 16-25-1(3) and 16 — 25A—1(1), only persons employed by public schools or college institutions may participate in the TRS and PEEHIP. No evidence indicates that the Consortia took the steps necessary to qualify their employees for participation in those programs pursuant to the exceptions to those general provisions. See §§ 16-25-1(3) and 16-25A-11. Additionally, the employees’ affidavits indicate that their *329 children were entitled to receive free tuition at two-year colleges within the College System. This evidence supports the conclusion that the employees were employed by the colleges.
In light of the foregoing evidence, we cannot say that the ALJ’s conclusion that employment relationships existed between the employees and the colleges was not supported by any legal evidence or was arbitrary. Additionally, in light of the foregoing evidence showing a close relationship of control between the colleges and the Consortia, we cannot say that the ALJ erred in his conclusions regarding the relationships between those entities.[10] Although this court may have reached a different conclusion based on the evidence, because the ALJ’s factual findings were supported by legal evidence the ALJ’s conclusion that the employees were employed by “two-year educational institutions under the control and auspices of the State Board of Education” and therefore were governed by the FDA may not be disturbed. § 36-26-100. Therefore, the Consortia’s arguments as to this issue are not well-taken.
Under the FDA, only nonproba-tionary employees are entitled to notice and a hearing before being discharged. §§ 36-26-101 and -102. The ASTC Personnel Manual mandated a 6- to 12-month probationary period for new employees. All the employees had held their positions for more than a year. Accordingly, they were nonprobationary employees under the FDA, §§ 36-26-101(a) and -102. As a result, the employees were entitled to notice and a hearing under §§ 36-26-103 and -104, and the ALJ had jurisdiction of their appeals under § 36-26-115. We, therefore, reject the Consortia’s contention that the ALJ did not have jurisdiction over the employees’ appeals.
B. Common-Law Certiorari
Section 36-26-115 states: “Action taken by the Administrative Law Judge under this section shall be final.” The employees argue that this provision deprives the Consortia of the right to obtain judicial review of the ALJ’s decision, even via a petition for the common-law writ of certiorari and, therefore, that the circuit court and this court lack jurisdiction to review the ALJ’s decision.
It is undisputed that the finality language of § 36-26-115 prohibits an appeal from an ALJ’s decision under that section. See Board of Sch. Comm’rs of Mobile County v. Biggs, 939 So.2d 942, 946 (Ala. Civ.App.2006) (“We must conclude that under § 36-26-115 the Alabama Legislature intended that the decision of an administrative law judge after a school board denies an employee a hearing is final and that there is no right to appeal that decision.”).
In Biggs, the regular work locations of bus inspectors employed by the Board of School Commissioners of Mobile County (“the employer”) were changed. The inspectors argued that they had been transferred and requested a hearing pursuant to the FDA. The employer denied the requests for a hearing, asserting that it had only changed the inspectors’ work locations and had not transferred them and, thus, had not triggered the notice and hearing requirements of the FDA. The inspectors filed appeals with the attorney general’s office pursuant to § 36-16-115, and the ALJs assigned to the cases held that the inspectors were entitled to hearings. The employer filed notices of appeal *330 to the circuit court, but it did not seek review via a petition for a common-law writ of certiorari. The circuit court dismissed the action based on the finality-language of § 36-16-115.
The employer then appealed to this court, and the inspectors again argued that the employer had no right to appeal. This court reviewed the history of the FDA, noted that “ ‘the legislature may prohibit an appeal in a particular type of case,’ ” and held that, pursuant to the finality language of § 36-16-115, the employer had no right to appeal. Biggs, 939 So.2d at 946 (quoting Ex parte Smith, 394 So.2d 45, 47 (Ala.Civ.App.1981)). Among other things, the employer argued that it could seek review via a petition for a common-law writ of certiorari. However, because the employer had not filed such a petition and had not made that argument before the circuit court, this court “decline[d] to determine the issue whether an administrative law judge’s decision under § 36-26-115 is subject to review in the courts through a petition for a writ of certiorari.” Biggs, 939 So.2d at 947.
The precise issue that we declined to reach in Biggs is presented to us in this appeal. The Consortia have sought review of the ALJ’s decision via petitions for a common-law writ of certiorari. The Consortia argue that because the FDA does not provide a means of appeal, they may obtain judicial review of the ALJ’s decision via such a petition. To support their argument, the Consortia rely on Hughes v. Britnell, 554 So.2d 1041 (Ala.Civ.App.1989).
In Hughes, two maintenance workers at a college were discharged as the result of a budget reduction. The workers appealed the decision under the FDA, and an appeal panel decided that one worker’s hours would be reduced and that the other worker would be offered another position if one came available. At the time, § 36-26-106 provided: “The decision of the panel shall be final and binding upon the parties.” Eighteen months later, the workers filed complaints and petitions for a writ of mandamus with the circuit court. The circuit court granted a summary judgment in favor of the college, and the workers appealed.
This court affirmed the summary judgment based on the doctrine of laches and noted the correct procedure for appeal under the FDA.
“We wish to emphasize that since there is no provision for an appeal from a panel decision under the Fair Dismissal Act, the proper vehicle for review to the circuit court is by a writ of certiorari. Fields v. State ex rel. Jones, 534 So.2d 615 (Ala.Civ.App.1987); Ex parte Smith, 394 So.2d 45 (Ala.Civ.App.1981). From a decision by the circuit court on the writ of certiorari, review to this court would be on an appeal. Fields, 534 So.2d 615.”
Hughes, 554 So.2d at 1042-43 (emphasis added). Hughes involved an appeal from a panel decision under an earlier version of the FDA. The cases Hughes relied on, Fields v. State ex rel. Jones, 534 So.2d 615 (Ala.Civ.App.1987), and Ex parte Smith, 394 So.2d 45 (Ala.Civ.App.1981), likewise did not involve § 36-26-115, and it appears that the question of the availability of certiorari review of an ALJ’s decision under the current version of that section has not yet been addressed by any court of our state. However, this court’s decisions in Fields and Smith are instructive to our decision.
Fields involved an appeal from a circuit court’s decision to issue a writ of mandamus to the Jefferson County Personnel Board, directing the personnel board to award a sheriffs deputy injury-with-pay leave. Fields, 534 So.2d at 616. The dep *331 uty had petitioned the circuit court for a writ of mandamus after the personnel board had held a hearing and denied the deputy’s request for leave with pay. Id. This court ultimately reversed the circuit court’s decision, but this court noted that the Civil Service Enabling Act pursuant to which the deputy sought leave did not provide a right to appeal because the deputy’s request did not involve a disciplinary action. This court stated:
“We recognize that the legislature may properly limit the right to appeal. Ex parte Smith, 394 So.2d 45 (Ala.Civ.App. 1981). In cases such as this one, where a statute ‘provides no right of appeal or statutory certiorari, the common law writ of certiorari is the only available means of review.’ ”
Fields, 534 So.2d at 616.
In Ex parte Smith, a nurse at Cooper Green Hospital was dismissed for incompetency and inefficiency. The nurse appealed to the Jefferson County Personnel Board pursuant to the personnel board’s enabling act, which provided for such an appeal. After a hearing, the personnel board sustained the nurse’s dismissal. Pursuant to the enabling act, the nurse filed an appeal to a panel of the Jefferson Circuit Court, which likewise affirmed her dismissal. The nurse then petitioned this court for a writ of certiorari.
The enabling act at issue in Smith provided that the decision of the panel of the circuit court “ ‘shall be determinative of the case and there shall be no appeal to any appellate court of Alabama.’ ” Smith, 394 So.2d at 47. This court acknowledged, as quoted above, that the legislature may prohibit the right to appeal in particular types of cases. However, this court stated:
“Nevertheless, that prohibition of appeal by the legislature does not affect the authority of the court to review the proceedings below by granting certiorari. See, Ex parte Bracken, 263 Ala. 402, 82 So.2d 629 (1955). Because the Enabling Act provides no right of appeal or statutory certiorari, the common law writ of certiorari is the only available means of review. Phelps v. Public Service Comm’n, 46 Ala.App. 13, 237 So.2d 499 (1970).”
Smith, 394 So.2d at 47-48.
Based on Hughes, Fields, and Smith, the Consortia argue that, although § 36-26-115 states that an ALJ’s decision is final, the Consortia still may obtain judicial review via a petition for the common-law writ of certiorari. We agree. In enacting the finality language of § 36-26-115, the legislature has properly limited the right to appeal from an ALJ’s decision under that section. “Nevertheless, that prohibition of appeal by the legislature does not affect the authority of the court to review the proceedings below by granting certiorari.” Smith, 394 So.2d at 47-48. The Consortia, therefore, have properly sought review of the ALJ’s decision via the only available means of review, a petition for a common-law writ of certiorari.
Citing our statement in Biggs that a legislative purpose of the FDA was “ ‘to streamline the contest and appeal processes for employees,’ ” Biggs, 939 So.2d at 944 (quoting Act No. 2004-567, Ala. Acts 2004), the employees argue that allowing review of an ALJ’s decision via a petition for the common-law writ of certiorari would impermissibly interfere with the time standards and streamlined appeals process established by the FDA. As discussed above, the legislature may properly limit the right to appeal in order to streamline the resolution of grievances; it undoubtedly did so when it enacted the FDA. However, the legislature may not strip the courts of the authority to review *332 the decisions of lower tribunals via a petition for the common-law writ of certiorari.
This court has both statutory and constitutional authority to review the decisions of inferior tribunals via a petition for a writ of certiorari. Section 12-3-8, Ala. Code 1975, provides: “The judges of [the Court of Civil Appeals] shall each have authority to issue writs of certiorari and to grant orders for stays of judgments or orders to all inferior courts and injunctions, subject to the limitations prescribed by law.” Section 12-3-11, Ala.Code 1975, grants to this court the “authority to grant injunctions and issue writs of habeas corpus and such other remedial and original writs as are necessary to give it a general superintendence and control of jurisdiction inferior to it and in matters over which it has exclusive appellate jurisdiction .... ” Furthermore, Art. VI, § 141(c), Ala. Const.1901, grants this court “the power to issue' all writs necessary or appropriate in aid of appellate jurisdiction of the courts of appeals.” The constitution grants similar authority to the circuit court. Art. VI, § 142(b), Ala. Const. 1901 (“The circuit court may be authorized by law to review decisions of state administrative agencies and decisions of inferior courts. It shall have authority to issue such writs as may be necessary or appropriate to effectuate its powers, and shall have such other powers as may be provided by law.”).
Our supreme court explained the relationship between its authority to supervise and control inferior tribunals pursuant to Art. VI, § 140, Ala. Const.1901, and the legislature’s authority to limit the right to appeal as follows.
“The legislature may limit, restrict or abolish appeals. Constitution 1901, § 140; Woodward Iron Co. v. Bradford, 206 Ala. 447, 90 So. 803 [ (1921) ]. But in the same constitutional section is conferred on the Supreme Court a general superintendence and control over all inferior courts. Williams v. Louisville & N.R. Co., 176 Ala. 631, 58 So. 315 [ (1912) ]. But the right of certiorari is not affected by any appeal provisions of the act and on certiorari a limited review would be available. ...
“As we understand it, there is some contention that under such an appeal provision in the act making the judgment of the circuit court final, this court is inhibited from reviewing any action by certiorari. The legislature, however, cannot prohibit this court from exercising the power granted it under § 140 of the Constitution.”
Ex parte Bracken, 263 Ala. 402, 405, 82 So.2d 629, 631 (1955). Similarly, the legislative policies for which the FDA was enacted may not interfere with the statutory and constitutional authority of this court to exercise “general superintendence and control of jurisdiction[s] inferior to it and in matters over which it has exclusive appellate jurisdiction.” § 12-3-11. The employees’ arguments regarding the policy implications of the FDA, therefore, are unavailing.
The employees also argue that the Consortia have no right to pursue a common-law writ of certiorari because another means of appeal exists. Section 36-26-115 grants the ALJ the authority to: “(1) [o]r-der a hearing before the local board, (2) determine that the employee has been transferred ... or dismissed in violation of the law and rescind the [employer’s] action ..., or (3) sustain the [employer’s] action .... ” The employees conceded at oral argument that if the ALJ sustained the terminations under § 36-26-115(3) or made a substantive determination and rescinded the terminations under § 36-26-115(2), the decision would be final and appropriate for review via a petition for a writ of certiora-ri, if this court held that such a writ was *333 appropriate. According to the employees, the ALJ’s decision in this case is preliminary in nature because the ALJ ordered a hearing under § 36-26-115(1). Thus, the employees maintain, the case is not appropriate for certiorari review because, according to the employees, the Consortia may take an appeal after such a hearing is held. See, e.g., Norton v. Staples, 377 So.2d 1095, 1097 (Ala.Civ.App.1979) (“common-law certiorari will not lie when an adequate remedy is available by appeal”); § 36-26-104 (providing for appeals from the final decision of a hearing officer).
However, the ALJ made a substantive finding that the employees had been denied notice and a hearing, and he ordered that the terminations be rescinded, that their employment be reinstated, and that no subsequent termination be taken without notice and a hearing. We view the ALJ’s decision as having been made under § 36-26-115(2), not § 36-26-115(1). The ALJ did not order that a hearing be held by a panel or hearing officer to determine whether the actions of the colleges should be rescinded and the employees reinstated. The ALJ made that determination himself, and he ordered that the terminations be rescinded. In light of the employees’ concession at oral argument and the plain language of the ALJ’s order, we hold that the ALJ’s decision was final and appropriate for review via a petition for a common-law writ of certiorari.
C. Similarly Situated Employees
McGowin, Mullins, and Stinson each purported to appeal to the ALJ pursuant to § 36-26-115, individually and on behalf of all similarly situated employees. The ALJ’s May 24, 2006, order stated that “all of the [colleges’] employees who are situated as are the [employees] in the case sub judice[] are subject to the FDA.” The Consortia argue that because § 36-26-115 does not grant such authority, the ALJ erred in applying his order to all similarly situated employees of the colleges. The employees argue that the ALJ did not exceed his authority because he did not apply his order to “a class” of individuals. The employees reason, without citing to authority, that the ALJ’s May 24, 2006, order simply gave notice that the attorney general’s office would apply the principle of stare decisis in future appeals under § 36-26-115.
The FDA does not expressly grant the ALJ authority to decide cases on a class-wide basis, as does, for example, the Taxpayers’ Bill of Rights and Uniform Revenue Procedures Act, § 40-2A-9, Ala.Code 1975. Nor does it expressly grant to the ALJ the authority to decide matters on behalf of individuals who are not parties to the appeals before it. Additionally, we have found no Alabama case expressly discussing the stare decisis effect of an ALJ’s decision under § 36-26-115.
This court and our supreme court have recognized the need for consistency in administrative decisions. See, e.g., Continental Tel. Co. of the South v. Alabama Pub. Serv. Comm’n, 479 So.2d 1195, 1213 (Ala.1985); Mobile County Gas Dist. v. Mobile Gas Serv. Corp., 284 Ala. 664, 670-71, 227 So.2d 565, 570-71 (1969); and Brookwood Health Serv., Inc. v. Baptist Health Sys., Inc., 936 So.2d 529, 536 (Ala.Civ.App.2005). However, our courts have also made clear that the doctrine of stare decisis “does not apply to administrative decisions.” Brookwood Health Serv., 936 So.2d at 536; see also Mobile County Gas Dist., 284 Ala. at 671, 227 So.2d at 571. In determining whether decisions of an administrative agency impermissibly conflict, our supreme court has stated: “Because there is need for flexibility in administrative decisionmaking, the doctrine of stare decisis generally does not *334 bind administrative agencies to their prior decisions. Thus, when inconsistent determinations are made by an administrative agency, the issue is whether the agency has acted in an arbitrary and capricious manner.” Ex parte Shelby Med. Ctr., Inc., 564 So.2d 68, 68 (Ala.1990). Accordingly, although there is a need for consistency in administrative decisions, “where the circumstances are the same in all material respects,” Mobile County Gas Dist, 284 Ala. at 671, 227 So.2d at 571, the doctrine of stare decisis generally will not apply to an ALJ’s decision under § 36-26-115. We see no reason to depart from the general rule in this case.
The plain language of the ALJ’s May 24, 2006, order in this case purported to apply its holding to all similarly situated employees of the colleges. Contrary to the employees’ assertion, this language does more than simply recognize the doctrine of stare decisis, which, as we have said, generally would not apply to the ALJ’s decision. The plain language of the order instead attempts to render a decision regarding the applicability of the FDA as to unspecified employees who were not before the ALJ. Such a holding is not authorized by the FDA, see § 36-26-115, and, in the absence of statutory authority, is an impermissible exercise of jurisdiction.
Accordingly, to the extent that the ALJ applied his May 24, 2006, order to parties not before him, he exceeded his jurisdiction.
D. Rea’s Action
In light of our decision that the ALJ exceeded his discretion in applying his May 24, 2006, order to employees not before him, the ALJ’s February 13, 2007, order in Rea’s action based on the “similarly situated” language of the May 24, 2006, decision, must also be reversed.[11]
VII. Conclusion
Accordingly, we affirm the circuit court’s judgment to the extent it affirmed the ALJ’s ruling that the employees were governed by the FDA and, therefore, were entitled to notice and a hearing before being discharged or transferred. We reverse the circuit court’s judgment to the extent that it affirmed the ALJ’s application of the May 24, 2006, order to individuals who were not parties to the appeals before it. We likewise reverse the circuit court’s judgment to the extent that it affirmed the ALJ’s decision in Rea’s action. We also reverse the circuit court’s judgment to the extent that it held that no review via a petition for the common-law *335 writ of certiorari may be had from an ALJ’s decision under § 36-26-115. Therefore, we remand this action to the circuit court with instructions that it issue a writ of certiorari and require the ALJ to rescind his May 24, 2006, order to the extent that that order applied to individuals who had not been made parties to the appeals before it and require the ALJ to rescind his February 13, 2007, order in Rea’s action and to reconsider her appeal in light of the holdings of this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. Rea did not challenge the termination of her employment until December 18, 2006.

. The parties agree that the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala.Code 1975, does not govern their dispute.

. Most of the recommendations relate to the structure of the College System, the oversight of community-college resources, and the role of the Board of Education.

. The Recommendations were approved, "as amended”; however, the record does not show exactly what provisions the Board of Education amended or how.

. No such contracts have been made a part of the record,

. Two consortia established by the Chancellor’s Report are not at issue in this case and, therefore, are not discussed herein.

. We note that the standard of review set forth in Glass v. Anniston City Board of Education, 957 So.2d 1143, 1148-49 (Ala.Civ. App.2006), regarding the appellate review of hearing officers' decisions, does not apply to this case. In Glass, the circuit court issued a writ of certiorari to review a hearing officer’s decision and subsequently affirmed the decision. Unlike the procedural circumstances presented in Glass, the appeal in this case is from the denial of a petition for a writ of common-law certiorari.

. Peterson was decided with four justices joining in the main opinion, two justices concurring in the result, one justice concurring in part and dissenting in part, and two justices dissenting. The justice who concurred in part and dissented in part concurred with the main opinion except for the discussion of certain federal regulations. Accordingly, those portions of the main opinion quoted herein represent the majority opinion of our supreme court.

. See also Merrell v. Joe Bullard Oldsmobile, Inc., 529 So.2d 943, 945 (Ala.1988) ("Generally, a dispute over the existence of an agency relationship involves a question of fact for the jury.”); Ex parte Western Ry. of Alabama, 283 Ala. 6, 12, 214 So.2d 284, 289 (1968) (“Here an essential and material element of the plaintiff's cause of action was the existence of an employer-employee relationship. Such fact constituted a part of the plaintiff's cause of action, or of the defendant's defenses. It must be proved in a trial on the merits if the plaintiff is to succeed. Having a constitutional right to have a jury determine this factual issue in a trial on the merits, we can see no reason why the determination of this same factual question is not as fully a jury question when presented by a plea in abatement.”); and Nichols v. Smith’s Bakery, Inc., 218 Ala. 607, 608, 119 So. 638, 639 (1928) ("The complaint alleges the decedent was not an employee of defendant.” "[The evidence] was sufficient to carry the case to the jury upon that issue.").

. In light of this conclusion, we need not address the employees’ argument that the Consortia lack standing to seek review of the ALJ's decision.

. Additionally, we note that the parties dispute whether Rea waived her right to challenge her discharge by waiting 18 months after she was discharged to seek an appeal to the ALJ pursuant to § 36-26-115. Although we question whether Rea’s action was timely, see Hughes v. Britnell, 554 So.2d at 1042 ("The Alabama Supreme Court has stated that ‘the overall purpose of the "Fair Dismissal Act,” ... [is] to provide nonteacher employees a fair and swift resolution of proposed employment terminations.' ... Thus, we hold that a litigant may not, without excuse, delay the proceedings without running the risk of having the action barred by laches.”), the Consortia have not cited any authority regarding this issue in their brief on appeal.
See, e.g., White Sands Group, L.L.C. v. PRS II, L.L.C., 998 So.2d 1042, 1058 (Ala.2008) ("Rule 28(a)(10) requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived. ... ‘This is so, because " 'it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.' ”' limmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in turn Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994)).”).